IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| POGO RESOURCES, LLC, § | | |
| Plaintiff, § | | |
| § | Civil Action No. 3:19-CV-2682-BH | |
| v. § | | |
| § | | |
| ST. PAUL FIRE AND MARINE § | | |
| INSURANCE COMPANY, A MEMBER § | | |
| COMPANY OF THE TRAVELERS § | | |
| GROUP OF INSURERS, § | | |
| Defendant. § | Consent Case[1] | |

## MEMORANDUM OPINION AND ORDER

Before the Court is *Defendant's Motion to Strike Testimony and Expert Report of Mark Larson*, filed December 31, 2020 (doc. 48). Based upon the relevant filings, evidence, and applicable law, the motion is **GRANTED in part** and **DENIED in part**.

### I.  BACKGROUND

This is an insurance coverage dispute between Pogo Resources, LLC (Plaintiff) and St. Paul Fire and Marine Insurance Company (Defendant) involving a pollution clean-up claim for a spill at a saltwater disposal well. (*See* doc. 9 at 2.)[2] Defendant issued separate commercial general liability policies to Plaintiff (Pogo Policies) and to Paladin Energy Corporation (Paladin) (Paladin Policies). (*Id.* at 6.) Both policies had a provision stating that Defendant will "pay amounts you voluntarily incur, or you or any other protected person is legally required to pay, for covered pollution clean-up costs that are incurred . . . ." (*Id.* at 7.) Plaintiff later acquired substantially all the assets of Paladin during its Chapter 11 bankruptcy through a Stalking Horse Purchase and Sale Agreement (PSA).

---

[1] By consent of the parties and the order of transfer dated January 29, 2020, this case has been transferred for the conduct of all further proceedings and the entry of judgment.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

(*Id.* at 2.)  Prior to the bankruptcy court's approval of the sale, saltwater spill incidents occurred at two of Paladin's wells in February 2017 (Spill A) and June 2017 (Spill B). (*Id.* at 3.)  Claims for coverage under the Paladin Policies were submitted for both spills and were initially approved by Defendant.  (*Id.* at 3.)

    Plaintiff hired environmental consultant, Mark Larson, and his firm to assist with the clean-up of Spill B.  On June 21, 2017, Larson submitted the spill delineation plan he prepared for Spill B to the New Mexico Oil Conservation Division (NMOCD); spill delineation was later performed on June 28, 2017, July 7, 2017, and January 3, 2018. (doc. 50 at 26.)  Larson also prepared the remediation plan for Spill B, with an estimated cost of $840,230.24, and the NMOCD approved it in June 2018. (*Id.* at 25.)  The landowner of the site of Spill B rejected this plan, demanded a remediation plan costing over $3.5 million, and refused access to the site. (doc. 9 at 4.)  In May 2019, Defendant informed Plaintiff that coverage for Spill B was precluded under the total pollution exclusions in Paladin Policies. (*Id.* at 4-5.)  Prior to this determination, it had fully paid the claim for Spill A, and had paid some of the expenses and costs for Spill B. (*Id.* at 4.)

    Plaintiff sued, asserting claims for mutual mistake/reformation, waiver, estoppel, tortious interference, breach of contract, bad faith, and deceptive trade practices. (*See* doc. at 9.)  It seeks actual and exemplary damages, prejudgment and post-judgment interest, court costs, and attorney's fees. (*Id.* at 16.)  On August 12, 2020, Defendant moved to dismiss Plaintiff's claims for mutual mistake/reformation, waiver, and estoppel, as well as the deceptive trade practices and bad faith claims based on the Paladin Policies. (doc. 20.) On January 12, 2021, Defendant's motion to dismiss under Rule 12(c) was granted, and these claims were dismissed with prejudice. (*See* doc. 53.)

    According to Larson's *Expert Opinion for Delineation and Remediation East Caprock SWD*

*Well #5, Lea County, New Mexico*, dated August 23, 2020, Plaintiff retained him "to provide a professional opinion for remediating a produced water spill according to [NMOCD] requirements at" the Spill B site, and "to include costs to verify delineation and costs to remediate [ ] the spill to NMOCD and landowner requirements." (*See* doc. 50 at 26.)  His report explains that the first remediation plan (Option A) "is based on the NMOCD rule allowing for restoring the upper four (4) feet of the surface area and re-vegetation according to (19.15.29.13NMAC)," and assumes approximately 33 days to complete with an estimated cost of $1,457,398.49.  (*Id.* at 28-29.)  The second remediation plan (Option B) is based on the demands of the landowner and involves "excavating the entire spill (122,928 square feet) to thirty (30) feet bgs and [ ] transporting and disposing approximately 136,590 cubic yards of soil," and assumes approximately 140 days to complete with an estimated cost of $7,958,997.49. (*Id.* at 29-30.)

On December 31, 2020, Defendant moved to exclude Larson's report and opinion testimony under Federal Rule of Evidence 702, and to strike his report under Federal Rule of Civil Procedure 26(a)(2)(B). (*See* doc. 49.)  With a timely filed response and reply, this motion is ripe for determination. (*See* docs. 54, 58.)

## II.  FEDERAL RULE OF EVIDENCE 702

Defendant seeks to exclude Larson's expert testimony under Rule 702 on grounds that neither of his opinions are relevant or reliable. (*See* doc. 49 at 10-18.)

Rule 702 governs the admissibility of expert testimony and provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

3

  (b) the testimony is based upon sufficient facts or data;

  (c) the testimony is the product of reliable principles and methods; and

  (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under this rule, the main issue is whether a particular expert has "sufficient specialized knowledge to assist the jurors in deciding the particular issues in this case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) (citations omitted). A court has discretion to keep an expert witness from testifying if it finds that the witness is not qualified to testify in a particular field or on a given subject. *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999). The key factors in evaluating expert testimony are relevance and reliability. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).

  The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence. *See Id.* at 592 n.10. The proponent does not have to demonstrate that the testimony is correct, only that the expert is qualified and the testimony is relevant and reliable. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The court's inquiry is flexible in that "[t]he relevance and reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (citation omitted). "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's] consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 783 (N.D. Tex. 2013).

A.     **Relevance**

Defendant argues that Larson's opinions are speculative and not relevant, and will not assist the trier of fact to understand the evidence or to determine a fact in issue. (doc. 49 at 11-14.)

Relevancy is defined as evidence that has "any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). The relevancy requirement ensures that the expert testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *See Daubert*, 509 U.S. at 592.  "Expert testimony which does not relate to any issue on the case is not relevant and, ergo, non-helpful." *Id.* at 590.

The amended complaint asserts that Defendant breached its insurance contracts with Plaintiff when it denied coverage for the Spill B clean-up claim, and it seeks actual damages.  The pollution clean-up costs provision included in both policies provides that Defendant will "pay amounts you voluntarily incur, or you or any other protected person is legally required to pay, for covered pollution clean-up costs that are incurred." (doc. 9 at 7.)  In a breach of contract action, a party is generally entitled to recover the damages that occurred as a result of the breach. *Peyton v. Lincoln College of Tech.*, 3:10-CV-02144-P-BH, 2012 WL 13026812, at *3 (N.D. Tex. Sept. 17, 2012) (quoting *CQ, Inc. v. TXU Mining Co., LP*, 565 F.3d 268, 278 (5th Cir. 2009)) ("'The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained.'"); *see also Pizza Hut, Inc. v. Lundy Enter., LLC*, No. 3:11-CV-0011-N, 2013 WL 12123949, at *3 (N.D. Tex. June 11, 2013) (explaining that the damages accrued must occur as a result of the breach of contract).

Larson's report states that he was asked "to provide a professional opinion for remediating a produced water spill according to [NMOCD] requirements at" the Spill B site, and "to include

5

costs to verify delineation and costs to remediate [ ] the spill to NMOCD and landowner requirements." (*Id.* at 26.) Larson's opinions on the projected clean-up costs and expenses of Spill B go to the issue of actual damages, i.e., the amounts Plaintiff will incur due to Defendant's alleged breach of the insurance contracts. His opinions make the assertion of damages actually sustained more plausible because they identify the steps and procedures to remediate Spill B along with the estimated costs. *See Mathis v. Exxon Corp.*, 302 F.3d 448, 460-61 (5th Cir. 2002) (affirming the district court's finding that the expert testimony of an economist had to be admitted because it made the party's arguments more plausible). If Plaintiff may recover the projected clean-up costs, Larson's opinions are directly relevant to the actual amount that it can recover. They will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 592.

Defendant argues that the opinions are "entirely irrelevant because they focus solely on projected or anticipated costs which are not insurable under the policy," and are speculative because it is uncertain whether clean-up will actually occur. (doc. 49 at 13.) Whether Plaintiff is entitled to actual damages goes to the merits of the case and not the admissibility of evidence. *See United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., State of Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996) (emphasizing that "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system"). An expert need not offer an opinion on an ultimate issue to be relevant; if his proposed testimony is helpful to assist the fact-finder to understand the evidence or to determine a fact in issue, it is relevant. *Rolls-Royce Corp. v. Heros, Inc.*, No. CIV.A. 307-CV-0739-D, 2010 WL 184313, at *2-3 (N.D. Tex. Jan. 14, 2010). Larson is not offering an opinion on the ultimate fact issue of whether Defendant breached the insurance policies. His opinions will assist the jury to determine what amount of damages, if any, Plaintiff sustained if it

6

finds in favor of a breach. Because Larson's testimony is relevant to the key issue of damages in this suit, exclusion on the basis of relevancy is inappropriate. *See Mathis*, 302 F.3d at 460-61.

**B.     Reliability**

Defendant argues that Larson's opinions regarding Option A and Option B are inadmissible because they are unreliable. (*See* doc. 49 at 14-18.)

Reliability requires an assessment of "whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." *See Daubert*, 509 U.S. at 592-93. The Supreme Court has suggested that trial courts examine a nonexclusive list of factors, including whether a theory or technique has or can be tested, published, subjected to peer review, whether it has or can be subjected to standards controlling its operation, the known or potential rate of error, and whether it is generally accepted. *Id.* at 593-94. The reliability determination ensures that the expert testimony is "supported by appropriate validation." *Id.* at 590.

"The *Daubert* reliability analysis applies to, among other things, 'the facts underlying the expert's opinion.'" *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 515 (5th Cir. 2013) (quoting *Knight,* 482 F.3d at 355). Under Federal Rule of Evidence 703, evidence relied upon by an expert need not be admissible if of a type reasonably relied upon by experts in that particular field. "Where an expert's opinion is based on insufficient information, the analysis is unreliable." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) (citing *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 671 (5th Cir. 1999). "If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). It is the burden of the party proffering the expert witness to prove that the facts, data, or opinions relied

7

upon are of the type customarily relied upon by experts in the field, and that such reliance is reasonable. *Moore*, 151 F.3d at 276.

### 1. Option A

Defendant argues that Larson's opinions regarding Option A are unreliable because he does not identify the data or facts he relies upon, or the methodology he uses, for his calculation of the purported remediation costs. (doc. 49 at 14.) It specifically contends that Larson failed "to explain the basis for the dollar amounts in the estimate, the identity or source of the amounts estimated, or the identity of the entity that will perform the remediation work for the estimated amounts." (*Id.*) It also claims that his report "does not set forth the basis for his supposed opinion that a new delineation plan is necessary, why the new remediation plan will cost over $600,000 more than a plan approved by the NMOCD, or the basis for the costs of his over $1.4 million dollar estimate to 'restore the surface.'" (*Id.* at 15.)

As discussed, Larson's report states that it analyzes the remediation options and costs according to current NMOCD requirements (Option A) and to the demands of the landowner (Option B). (doc. 50 at 26.) It lists multiple types of documents he reviewed in making his opinion: (1) a 1988 report on the hydrogeology and hydrogeochemistry of the Ogallala Aquifer; (2) a 1993 progress report on the Ogallala and Gatuna Formations; (3) a websoil survey by the Natural Resources Conservation Service of the United States Department of Agriculture; (4) NMOCD Guidelines for Leaks, Spills and Releases, dated August 13, 1993; (5) New Mexico Administrative Code, Chapter 15 Subpart 29; (6) the Delineation Report for Spill B, dated July 2017; (7) the Amended Delineation Report for Spill B, dated August 23, 2017; and (8) the Remediation Plan for Spill B, dated January 31, 2018. (*Id.* at 32.) It states that his firm submitted a spill delineation plan

to the NMOCD shortly after Spill B in June 2017, and that spill delineation was performed in June 2017, July 2017, and January 2018. The land area impacted by the spill is estimated at approximately 122,928 square feet, or 2.82 acres. (*Id.* at 28.) The report explains that the NMOCD used the August 1993 Guidelines for Leaks, Spill and Releases "as a guide to assist oil and gas operators in New Mexico with spill cleanup," but replaced those guidelines with rule 19.15.29 NMAC on August 14, 2018. (*Id.* at 26-27.) It notes that the "Restoration, Reclamation and Re-Vegetation requirement of 19.15.29.13 NMAC applies to the Site and requires the surface area to be substantially restored to the condition prior to the release or their final land use." (*Id.*)

Larson's report states that Option A "is based on the NMOCD rule allowing for restoring the upper four (4) feet of the surface area and re-vegetation according to (19.15.29.13NMAC)." (*Id.* at 28.) It explains that soil samples will be collected from twelve previously sampled locations prior to remediation "to confirm no significant changes in contaminant concentration and plume configuration." (*Id.* at 28-29.) If there are no significant changes, the upper four feet of soil in the spill area will be excavated, that approximately 18,000 to 20,000 cubic yards of contaminated soil will be hauled to a landfill, and that composite soil samples will be collected of the excavation area to test for BTEX, TPH, and chloride. (*Id.* at 29.) It further explains that the excavation will be filled with three feet of uncontaminated caliche, and that "[a] 12-inch thick topsoil layer will be placed over the caliche, and contoured, and seeded with BLM Mix 3." (*Id.*) The report states that the minimum estimated cost for restoring the surface to current NMOCD requirements is $1,457,398.49 and assumes approximately 33 days to complete. (*Id.*) It also provides a breakdown of the estimated costs for soil sampling and analysis, excavating and hauling, disposal, clean caliche/topsoil, backfilling and contouring, laboratory analysis, seeding, and project oversight and reporting. (*Id.*

9

at 209.) It explains that the estimated cost to remediate the spill in accordance with NMOCD requirements prior to August 14, 2018, was $840,230.24, and includes the estimated cost breakdown that Larson's firm had prepared in December 2017. (*Id.* at 25, 203-05.) As reflected in this breakdown, the prior plan provided for the restoration of soil within a depth that ranged between one and three feet throughout the spill site, involving the excavation and hauling of approximately 10,763 cubic yards of contaminated soil. (*Id.* at 203-05.)[3]

While framed as a contest to the reliability and relevancy of Larson's report, Defendant's challenges go to the weight, not admissibility, of the expert opinion. *See Primrose Operating Co. v. Nat'l American Ins. Co.*, 382 F.3d 546, 562-63 (5th Cir. 2004) (holding that questions relating to the bases and sources of an expert's opinion generally go to the weight of the opinion rather than its admissibility because it is "the role of the adversarial system, not the court, to highlight weak evidence"); *see also Fair v. Allen*, 669 F.3d 601, 607 (5th Cir. 2012) (noting that an expert's opinion will be excluded on this ground only when, for example, it is "completely unsupported," and "the opposing party must expose that lack of reliability"). Here, Larson prepared the spill delineation plan and reports after the spill, and he prepared the initial soil remediation plan that was approved by the NMOCD in 2018. It is clear that Larson had relied on the same types of costs and dollar amounts used in his prior remediation plan when calculating the estimated costs for Option A.

While Defendant maintains that his report provides no explanation as to why rule 19.15.29 NMAC "alters the estimated cost to remediate Spill B so dramatically," Larson's report explains that the new rule requires restoring the upper four feet of soil in the spill area with an estimated soil volume of between 18,000 and 20,000 cubic yards. (*See* doc. 50 at 25.) The prior restoration plan

---

[3] These values were calculated by aggregating the approximate soil volume to be extracted for each of the eight site locations identified in the breakdown. (*See* doc. 50 at 203-05.)

under the old NMOCD guidelines restored between one and three feet of soil in the spill area with an estimated soil volume of 10,763 cubic yards. (*Id.* at 203-05.) His report also explains that Option A includes the added costs for collecting and testing additional soil samples, as well as the added costs for seeding, backfilling, and contouring. (*Id.* at 29.) This is sufficient to show that Larson's Option A estimate is not so fundamentally unsupported that it should be excluded. Defendant's arguments as to the basis of Larson's Option A opinion should instead be addressed by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002) (quoting *Daubert*, 509 U.S. at 596). Its challenges goes to the weight to be given to Larson's expert testimony. *See Orthoflex, Inc.*, 986 F. Supp. 2d at 802 (finding that "the fact that [the expert] inspected only two units [in forming his expert opinion] goes to the weight, not admissibility, of his opinion testimony").

Plaintiff has met its burden to establish that Larson's expert testimony on the estimated costs of Option A is relevant and reliable. *See Equal Emp't Opportunity Comm'n v. S&B Indus., Inc.*, No. 3:15-CV-0641-D, 2017 WL 345641, at *7 (N.D. Tex. Jan. 24, 2017) (denying motion to exclude expert testimony based upon the expert's "allegedly limited and unreliable data, flawed methods, or faulty assumptions" because those "deficiencies ... can be attacked at trial"). Defendant's motion to exclude Larson's expert opinion on Option A is **DENIED**.

### 2.     *Option B*

Defendant argues that Larson's opinion regarding Option B is based solely on information provided by the Landowner with no supporting facts or data. (doc. 49 at 16.) His report allegedly "merely states the amount of the landowner's demand and provides a cost estimate without assessing the validity or reasonableness of the landowner's remediation plan and associated costs" and "is void

11

of any discussion regarding his research into the landowner's delineation plan, the facts or data forming the basis of the calculation of Option B, or the reasonableness of Option B." (*Id.* at 16, 18.)

Larson's report states that Option B is the remediation plan demanded by the landowner, and it involves "excavating the entire spill (122,928 square feet) to thirty (30) feet bgs and [ ] transporting and disposing approximately 136,590 cubic yards of soil." (doc. 50 at 29.) It explains that because this option is an excavation beyond twenty feet in depth, OSHA regulations require that an excavation safety plan be prepared, signed, and sealed by a licensed professional engineer, and that the excavation site will be subject to additional oversight and inspections for slope failure or instability. (*Id.*) It estimates cost for Option B as $7,958,997.49, and assumes approximately 140 days to complete it. (*Id.*) It also provides a breakdown of the estimated costs for geotechnical samples, analysis and safety plan, excavating and hauling, disposal, clean caliche/topsoil, backfilling and contouring, laboratory analysis, seeding, and project oversight and reporting. (*Id.* at 209-10.)

The report does not explain what documents Larson reviewed and relied upon when calculating the estimated costs for Option B, nor the basis for the cost figures he assumed. Even though the estimate is based on the remediation plan demanded by the landowner, the report fails to identify the specific facts upon which he relies. While experts are permitted to rely on assumptions when reaching their opinions, those assumptions must have some factual basis and an underlying rationale. *Jacked Up, LLC v. Sara Lee Corp.*, 291 F. Supp. 3d 795, 806–07 (N.D. Tex. 2018) (citations omitted). It is unclear whether any assumptions made were based on information provided by the landowner, and whether an independent analysis was performed on that information. *See GWTP Invs., L.P. v. SES Americom, Inc.*, No. 3:04-CV-1383-L, 2007 WL 7630459, at *5 (N.D. Tex. Aug. 3, 2007) ("An expert may rely upon figures calculated by another expert so long as he

12

conducts an independent investigation of those figures.").

The report also does not identify the methodology used or provide any explanation of the process used to determine the estimated cost for Option B.[4] Larson appears to be relying primarily, if not exclusively, on experience to calculate this estimate, but fails to articulate how his experience led to his conclusions, why his experience is a sufficient basis for those conclusions, and how his experience is reliably applied to the facts of the case. *See Kumho*, 526 U.S. at 152 (stressing that the *Daubert* factors may be relevant to the reliability of experience-based testimony, and that the same level of intellectual rigor that characterizes the practice of an expert in the relevant field is employed whether basing testimony upon professional studies or personal experience).

Plaintiff argues that Larson's opinions regarding Option B should not be struck because he was not offering an opinion on the validity or reasonableness of the landowner's remediation plan, but explaining the scope and costs associated with its legal liability if it is required to comply with the landowner's demands. (doc. 54 at 20.) It also admits that the landowner's demands are "unreasonable." (*Id.*) As discussed, Plaintiff's claim for damages are based on Defendant's alleged breach of the provision "to pay amounts you voluntarily incur, or you or any other protected person is legally required to pay, for covered pollution clean-up costs that are incurred." (*See* doc. 9 at 7.) Given the admittedly unreasonableness of Option B, and the fact that the landowner has not yet filed suit against Plaintiff, the costs associated with Option B appear too speculative to serve as a basis

---

[4]In its response, Plaintiff attaches an affidavit from Larson that provides additional information on the basis of his expert opinions. When the deadline for expert disclosures has passed, a party cannot submit a subsequent expert affidavit to cure deficiencies in the expert report or as a "supplemental" expert report without first seeking leave of court. *See Lampe Berger USA, Inc. v. Scentier, Inc.*, No. CIV.A. 04-354-C-M2, 2008 WL 3386716, at *2 n.3 (M.D. La. Aug. 8, 2008) ("Courts have [ ] made it clear that supplemental expert reports cannot be used to 'fix' problems in initial reports.") (collecting cases); *see also Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 571 (5th Cir. 1996) (explaining that the purpose of supplemental expert report is to supplement, not extend the expert disclosure deadline). Because Plaintiff did not seek and obtain leave to supplement its expert disclosures, or provide any explanation for the untimely disclosure, it is not considered.

for a breach of contract claim, and Larson's opinions on those costs will not aid the jury in this case. *See Sportsband Network Recovery Fund, Inc. v. PGA Tour, Inc.*, 136 F.3d 1329 (5th Cir. 1998) (affirming the exclusion of an expert's model for lost profits that was based on assumptions "so speculative that his testimony would be irrelevant and would not materially assist the trier of fact").

In conclusion, Larson's Option B cost estimate is based on unexplained assumptions with no apparent factual basis. *See Moore*, 547 F. App'x at 515 (excluding expert testimony where the expert "made a number of other assumptions that, while not strictly inconsistent with the evidence, had no basis in the record" and failed to "identif[y] some reason for assuming the facts he did for his analysis"); *see, e.g, Jacked Up, LLC*, 291 F. Supp. 3d at 809-10 ("Because Jacked Up has offered no evidence that Janik assessed the validity of the Sara Lee Pro Forma and because Jacked Up has failed to establish a factual basis for Janik's assumptions, the Court concludes that Janik's opinions are inadmissible under Federal Rule of Evidence 702."). Defendant's motion to exclude Larson's expert opinion regarding Option B is **GRANTED**.

### III. FEDERAL RULE OF EVIDENCE 403

Defendant argues that Larson's testimony should be excluded under Federal Rule of Evidence 403 because "any probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury, and wasting time." (doc. 49 at 19.)

Federal Rule of Evidence 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly cumulative evidence." Fed. R. Evid. 403. "[T]o warrant exclusion, the danger of unfair prejudice—on this ground or any other—must *substantially* outweigh the probative value of the evidence." *United States v. Fields*, 483 F.3d 313,

354 (5th Cir. 2007) (emphasis in original). "[T]he application of Rule 403 must be cautious and sparing." *Id.* "Rule 403 is not designed to 'even out' the weight of the evidence." *Baker v. Canadian Nat'l/Ill. Cent. R.R.*, 536 F.3d 357, 369 (5th Cir. 2008).

Here, Defendant argues that Larson's testimony on remediation costs which are not recoverable under the policies "would be a waste of time for the jury and the Court." (doc. 49 at 19.) As discussed, Larson's expert opinion on the projected costs for the clean-up of Spill B is relevant to the key issue of the amount of damages to which Plaintiff may be entitled. It is highly probative and not substantially outweighed by any of the dangers identified in Rule 403. Defendant's motion to exclude Larson's testimony on this basis is **DENIED**.

### IV. FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)(B)

Defendant argues that Larson's report should be stricken because it fails to comply with the scheduling order and Rule 26. (doc. 49 at 19.)

Under Federal Rule of Civil Procedure 26(a)(2)(B), a party who retains an expert to provide expert testimony in a case must submit a report that includes: (1) a complete statement of all opinions of the witness and the reasons for them; (2) the facts or data the expert considered in forming his opinion; (3) any exhibits that will be used; (4) the witness's qualifications, including publications; (5) a list of all other cases in which he has testified in the previous four years; and (6) a statement of his compensation in the present case. Fed. R. Civ. P. 26(a)(2)(B)(i)-(vi). The purpose of the rule is to prevent a party from presenting "sketchy and vague" expert information that might lead to undue surprise for the opposing party at trial. *See* Advisory Committee Notes to the 1993 Amendments to Rule 26. If a party fails to provide information as required under Rule 26(a), he may not use that information or witness to "supply evidence on a motion, at a hearing, or at a trial,

15

unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Here, Larson's report does not include a list of all cases in which he has testified in the last four years or a statement of the compensation to be paid for his report and testimony in this case. (*See* doc. 50 at 22-221.) Under Rule 37(c)(1), however, the expert report should not be stricken if Plaintiff's violation of Rule 26(a)(2) "was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).[5]

"A district court considers four factors when determining if such a violation is harmless: (1) the explanation, if any, for the non-disclosing party's failure to comply with the discovery rule; (2) the prejudice to the opposing party; (3) the possibility of curing such a prejudice by granting a continuance; and (4) the importance of the evidence and related witnesses' testimony." *Reyes v. City of Farmers Branch, Texas*, No. 3:07-CV-900-O, 2008 WL 4791498, at *3 (N.D. Tex. Nov. 4, 2008) (citing *Barrett v. Atlantic Richfield Co.*, 95 F.3d 375, 380 (5th Cir. 1996)). "The Court has broad discretion in deciding whether a violation of Rule 26(a) is substantially justified or harmless." *Id.* (citing *United States v. $9,041,598.68*, 163 F.3d 238, 252 (5th Cir. 1998)).

Under the first factor, Plaintiff does not offer an explanation for the omissions. Regarding the second and third factors, Defendant has not explained how the omissions prejudiced it, or why a request for continuance would not cure any potential prejudice.[6] As for the fourth factor, the evidence contained in the report is clearly important to Plaintiff's case because it helps the trier of

---

[5]Plaintiff does not attempt to offer any "substantial justifications" for the omissions, so only the harm caused by the violation will be considered. *See Lofton v. McNeil Consumer & Specialty Pharm.*, No. CIV.A. 3:05CV1531LBH, 2008 WL 4878066, at *10 (N.D. Tex. July 25, 2008).

[6]Even though Larson's affidavit is not being considered as a supplement to his expert report, it includes a list of all other cases in which he has testified in the previous four years and a statement of his compensation in the present case. (*See* doc. 54-1 at 4-6.) This further diminishes any prejudicial effect caused by the initial omissions.

fact understand the alleged damages. Based on the four factors, Plaintiff's violation of Rule 26(a)(2) was harmless, and Larson's report should not be stricken. *See Chik-Kin v. Axis Surplus Ins. Co.*, No. 3:13-CV-2804-N, 2015 WL 3466723, at *2 (N.D. Tex. Jan. 21, 2015) (denying motion to strike an expert for failing to provide an expert report because "the continuance that [the court] granted on November 21, 2014 can cure much of this prejudice"). Defendant's motion to strike the report on this basis is **DENIED**.

## V.  CONCLUSION

Defendant's motion to exclude and strike Plaintiff's expert report and testimony is **GRANTED in part** and **DENIED in part**. Mark Larson's opinions regarding Option B are stricken and excluded.

**SO ORDERED** this 29th day of March, 2021.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

17