IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| POGO RESOURCES, LLC, | § | |
| **Plaintiff,** | § | |
| | § | **Civil Action No. 3:19-CV-2682-BH** |
| v. | § | |
| | § | |
| ST. PAUL FIRE AND MARINE | § | |
| INSURANCE COMPANY, A MEMBER | § | |
| COMPANY OF THE TRAVELERS | § | |
| GROUP OF INSURERS, | § | |
| **Defendant.** | § | **Consent Case**[1] |

## MEMORANDUM OPINION AND ORDER

Before the Court is *Defendant St. Paul Fire and Marine Insurance Company's 12(c) Motion to Dismiss and Brief in Support*, filed July 14, 2021 (doc. 71). Based upon the relevant filings and applicable law, the motion to dismiss is **DENIED**.

## I. BACKGROUND

This is an insurance coverage dispute between Pogo Resources, LLC (Plaintiff), a Texas oil and gas company, and St. Paul Fire and Marine Insurance Company (Defendant). (*See* doc. 63.)[2] Defendant issued Plaintiff a commercial general liability (CGL) policy and an umbrella excess protection insurance (Umbrella) policy for its oil and gas operations, effective March 1, 2017 to March 1, 2018 (collectively Pogo Policies). (*Id.* at 7; docs. 65-11–65-21.)

Paladin Energy Corporation (Paladin) was a Dallas-based oil and gas company that owned and operated oil and gas assets in Texas and New Mexico. (doc. 63 at 2.) Defendant issued Paladin a CGL policy and an Umbrella policy, effective from July 1, 2016 through July 1, 2017 (collectively

---

[1]By consent of the parties and the order of transfer dated January 29, 2020, this case has been transferred for the conduct of all further proceedings and the entry of judgment.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

Paladin Policies), which provide insurance coverage for, among other things, bodily injury and property damage and for pollution clean-up costs. (*Id.* at 7-8; docs. 65-1–65-10.) The CGL and Umbrella policy forms contain similar grants of coverage, have the same or substantially similar terms, and are altered in relevant part by two similar endorsements: the TOTAL POLLUTION INJURY OR DAMAGE AND POLLUTION CLEAN-UP COSTS EXCLUSION ENDORSEMENT - OIL AND GAS COMMERCIAL GENERAL LIABILITY (TPE Endorsement), which excludes coverage, and the YOUR ABOVE-GROUND OPERATIONS FOR DISPOSAL WELLS ENDORSEMENT - OIL AND GAS COMMERCIAL GENERAL LIABILITY (DW Endorsement), which broadens coverage.[3] (*See* docs. 63 at 13; 65-7 at 4; 65-6 at 16.)[4]

On April 21, 2016, Paladin filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Northern District of Texas. *See In re Paladin Energy Corp.*, No. 16-31590-bjh-11 (N.D. Tex. Bank.) (Paladin Bankr.). It continued to operate its business and to manage its bankruptcy estate as debtor-in-possession throughout the bankruptcy. (*See* Paladin Bankr., doc. 1.) In February 2017, saltwater spills occurred at two of its well sites in New Mexico (collectively Spill A). (doc. 63 at 4.) The New Mexico Oil Conservation Division (NMOCD) assigned a release remediation permit for Spill A, and Paladin filed a claim with Defendant for coverage under the Paladin Policies. (*Id.* at 5.)

On February 23, 2017, the bankruptcy court granted a motion to approve bidding procedures

---

[3]The similar endorsements in the Umbrella policy are the TOTAL POLLUTION INJURY OR DAMAGE AND POLLUTION CLEAN-UP COSTS EXCLUSION ENDORSEMENT - WITH EXCEPTION FOR CERTAIN BODILY INJURY, PROPERTY DAMAGE, POLLUTION COST OR EXPENSE RELATED TO AUTOS - OIL AND GAS UMBRELLA EXCESS LIABILITY and the YOUR ABOVE-GROUND OPERATIONS FOR DISPOSAL WELLS ENDORSEMENT - OIL AND GAS UMBRELLA EXCESS LIABILITY. (*See* doc. 65-10 at 13-14, 19.)

[4]The Pogo Policies have a similar DW Endorsement, but no TPE Endorsement. (*See* doc. 63 at 13.)

for the sale of Paladin's assets.  (*See* Paladin Bankr., doc. 213.)  On May 15, 2017, Paladin and Plaintiff executed a Stalking Horse Purchase and Sale Agreement (PSA), effective May 1, 2017, for the purchase of substantially all of Paladin's oil and gas property, including, among other things, "any interests related to insurance policies that may be in place to cover any liability outlined in or related to" the environmental obligations assumed by Plaintiff, and "[a]ll Claims arising from acts, omissions or events, or damage to or destruction of" such property "whether on or after the Effective Date, and all related rights, titles, claims and interests of" Paladin (collectively the Property). (docs. 63 at 2; 63-1 at 18-19, 46-47.)

On June 11, 2017, a spill occurred at another Paladin well site in New Mexico (Spill B), and Paladin notified Plaintiff of Spill B on June 14, 2017. (doc. 63 at 5.)  It also notified Defendant and filed a claim for coverage under the Paladin Policies for the costs associated with Spill B, and the NMOCD assigned a release remediation permit for Spill B. (*Id.*)

On or about July 13, 2017, Plaintiff's insurance broker sent Defendant a schedule of the Paladin wells Plaintiff had acquired, and reminded it of the outstanding pollution claims for Spills A and B. (*Id.* at 4.)  On the same day, a claims adjuster for Defendant confirmed that it "would be paying for both claims." (*Id.* at 5.)  By email dated July 14, 2017, the adjuster to Paladin stated that she had reviewed the Paladin Policies and did not see a deductible under Defendant's general liability policy.  (*Id.*; doc. 63-4.)

On July 21, 2017, the bankruptcy court approved the sale of substantially all of Paladin's assets to Plaintiff under the PSA, and issued an order authorizing the assumption and assignment or negation of executory contracts and unexpired leases, if necessary (Sale Order). (*See* Paladin Bankr., doc. 266.)  The sale closed on August 18, 2017, with Plaintiff and Paladin entering an

Assignment and Bill of Sale (Assignment), effective May 1, 2017, which incorporated the terms of the PSA. (docs. 63 at 2; 63-3.) On September 7, 2017, Defendant sent Paladin two letters stating that it had "settled the property damage claim filed against your St. Paul Fire And Marine policy" in connection with Spill A. (docs. 63 at 5; 63-4.)[5]

In October 2017, Plaintiff, Paladin, and EeTradeco, LLC (EeTradeco) entered into a Transition Agreement "to vest EeTradeco with the power and authority to assist in effectuating the orderly transitions of the rights and responsibilities relating to" Spills A and B and to certain properties assigned to Plaintiff under the PSA. (docs. 63 at 2; 63-2.) On November 29, 2017, Defendant's adjuster emailed EeTradeco requesting "information on the status of [NMOCD's] approval of the completed clean-up on Spill A, and the proposed remediation plan on Spill B." (doc. 9 at 5.) On the same day, EeTradeco notified the adjuster that Plaintiff "had been operating the assets since mid-August and forwarded the environmental consulting invoices for reimbursement." (*Id.*) On June 11, 2018, NMOCD emailed Plaintiff, Defendant, and a third-party remediation contractor that the proposed remediation plan for Spill B was approved. (*Id.* at 5; doc. 63-7.)

On January 19, 2018, the bankruptcy court issued an order confirming the Chapter 11 liquidation of Paladin. (*See* Paladin Bankr., doc. 301.) On or about February 28, 2019, a conference call was conducted between Defendant, Plaintiff, the impacted landowners, their lawyers, and the remediation contractor, regarding the approved remediation plan for Spill B. (doc. 63 at 6.) The landowners rejected the plan and demanded a complete removal and replacement of soil at an estimated cost of $3.5 million. (*Id.*) On May 28, 2019, Defendant sent Plaintiff a letter denying coverage for Spill B under the Paladin Policies based, among other things, on the "total pollution

---

[5]Plaintiff alleges that it "has been fully compensated for the costs associated with responding to Spill A" and "does not seek any additional payment from [Defendant] for Spill A at this time." (doc. 63 at 5.)

exclusion" endorsement that altered coverage for "pollution clean-up costs." (*Id.*; doc. 63-8.)

Plaintiff's Second Amended Complaint asserts claims under the Paladin and Pogo Policies for breach of contract, bad faith, violations of Chapter 541 of the Texas Insurance Code, tortious interference, and declaratory judgment. (doc. 63 at 13-17.) Plaintiff seeks actual and exemplary damages, prejudgment and post-judgment interest, court costs, and attorneys' fees under Tex. Civ. Prac. & Rem. Code §§ 38.001 and 37.009 and Tex. Ins. Code § 541.152. (*Id.* at 17-18.) It also requests an order declaring that Defendant "owes a duty under the Paladin and Pogo policies to 1) defend [it] against the landowner's demands related to Spill B; and 2) to indemnify [it] for the costs it has incurred and will continue to incur as a result of its legal liability to clean-up Spill B." (*Id.* at 14.) On July 14, 2021, Defendant moved to dismiss the tortious interference claim and the claims for breach of contract and bad faith under the Paladin Policies under Rule 12(c) of the Federal Rules of Civil Procedure. (doc. 71.) Plaintiff responded on July 30, 2021, and Defendant replied on August 18, 2021. (docs. 82, 90.)

## II.  MOTION FOR JUDGMENT ON THE PLEADINGS

Defendant moves to dismiss Plaintiff's claims under the Paladin Policies for breach of contract and bad faith on grounds that it lacks standing and fails to state a claim. (*See* doc. 71.)[6]

Parties may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c).  Rule 12(c) motions are "designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Great Plains Trust Co.*

---

[6]Defendant also moves to dismiss Plaintiff's tortious interference claim, but Plaintiff abandoned the claim in its response to the motion. (*See* docs. 71 at 22; 82 at 6 n.2.) The motion to deny the tortious interference claim is therefore denied as moot.

*v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002) (quoting *Hebert Abstract Co. v. Touchstone Props.*, Ltd., 914 F.2d 74, 76 (5th Cir. 1990)).  The standard for deciding a motion under Rule 12(c) is the same as the one for deciding a motion to dismiss under Rule 12(b)(6). *See Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007); *see also Shaunfield v. Experian Info. Sols., Inc.*, 991 F. Supp. 2d 786, 793-94 (N.D. Tex. 2013) (citing *Id.*) ("As with a Rule 12(b)(6) motion, the question under Rule 12(c) is whether the plaintiff is entitled to offer evidence to support his claim, not whether he will ultimately prevail on the merits.").

Rule 12(b)(6) allows motions to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  Under the 12(b)(6) standard, a court cannot look beyond the face of the pleadings. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996); *see also Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999), *cert. denied*, 530 U.S. 1229 (2000).  Pleadings must show specific, well-pleaded facts, not mere conclusory allegations to avoid dismissal. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992).  The court must accept those well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Baker*, 75 F.3d at 196.  "[A] well-pleaded complaint may proceed even if its strikes a savvy judge that actual proof of [the alleged] facts is improbable, and 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citation omitted).  Nevertheless, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555*; accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasizing that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").  The alleged facts must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  In short, a complaint fails to state a claim upon which relief may be granted when

it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probably requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Iqbal*, 556 U.S. at 678 (citations omitted). When plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570; *accord Iqbal*, 556 U.S. at 678.

As noted, a court cannot look beyond the pleadings in deciding a motion to dismiss. *Spivey*, 197 F.3d at 774; *Baker*, 75 F.3d at 196. When a party presents "matters outside the pleadings," a court has "complete discretion" to either accept or exclude the evidence for purposes of determining the motion. *Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 196 n.3 (5th Cir. 1988); *accord Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 F. App'x 775, 783 (5th Cir. 2007). "If ... matters outside the pleading[s] are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Nevertheless, "pleadings" for purposes of a motion to dismiss include attachments to the complaint. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). Similarly, documents "attache[d] to a motion to dismiss are considered part of the pleadings, if they are referred to in the plaintiff's complaint and are central to her claim[s]." *Collins*, 224 F.3d at 499 (quotations omitted); *accord Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 725 (5th Cir. 2003). Accordingly, documents falling in these categories may be properly considered without converting the motion to dismiss into a motion for summary judgment.

7

Here, Plaintiff referenced and attached to the Second Amended Complaint copies of the PSA, the Assignment, the Transition Agreement, letters and email correspondence from the parties and NMOCD, printouts of Defendant's website, and excerpts of the Paladin and Pogo Policies. (*See* docs. 63-1–63-10.)  These documents are therefore considered part of the pleadings. *See Katrina Canal Breaches Litig.*, 495 F.3d at 205.  The Second Amended Complaint also referenced court records in the Paladin Bankruptcy, which can be judicially noticed because they are matters of public record and their contents cannot reasonably be disputed. *See Norris v. Hearst Tr.,* 500 F.3d 454, 461 n.9 (5th Cir. 2007); *see also Wang v. Prudential Ins. Co. of America*, 439 F. App'x 359, 363 (5th Cir. 2011) (holding that the district court "did not impermissibly consider documents outside of the record in deciding the motion to dismiss, as the documents referred to were public court filings"); Fed. R. Evid. 201(b)(2) (a court may take judicial notice of a fact when it "can be accurately and readily determined from sources whose accuracy cannot reasonably be disputed"). Defendant attached to its answer certified copies of the Paladin and Pogo Policies, and its motion references these documents. (*See* docs. 65-1–65-21.)  Because all of these documents are either referenced in the Second Amended Complaint or are central to its general theory of the case, they are considered part of the pleadings. *See Collins*, 224 F.3d at 498.  Conversion of Defendant's motion for judgment on the pleadings into a summary judgment motion is therefore unnecessary.

## A.   **Standing**

Defendant argues that Plaintiff lacks standing to pursue its claims based on the Paladin Policies. (doc. 71 at 9.)[7]

---

[7]"Standing has both constitutional and prudential aspects." *Logan v. Burgers Ozark Country Cured Hams Inc.*, 263 F.3d 447, 460 n.9 (5th Cir. 2001) (citation omitted). The argument that a plaintiff lacks standing to enforce insurance policies issued to a third party implicates prudential standing.  Prudential standing encompasses "[j]udicially created limits" that concern whether: (1) a plaintiff's grievance falls within the zone of interests protected by the statute invoked,

Under Texas law,[8] "to establish standing to assert a claim under a contract, a party must prove its privity *to the agreement* or that it is a third-party beneficiary." *Associated Int'l Ins. Co. v. Scottsdale Ins. Co.*, No. 4:16-CV-00498, 2016 WL 10954506, at *1 (S.D. Tex. July 13, 2016) (citing *Brown v. Mesa Distribs., Inc.*, 414 S.W.3d 279, 284 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (emphasis original); *see Solis v. Evins*, 951 S.W.2d 44, 47 (Tex.App.—Corpus Christi 1997, no writ) (holding that privity of contract is an essential element to any recovery based on contract); *Jensen Constr. Co. v. Dallas County*, 920 S.W.2d 761, 772 (Tex.App.—Dallas 1996, writ denied) (same); *see generally Campbell v. Auto. Ins. Co. of Hartford Connecticut*, 07-06-0158-CV, 2007 WL 1390625, at *2 (Tex. App.—Amarillo May 9, 2007, no pet.) ("With respect to property insurance policies, Texas law has long held that a party who is a complete stranger to the contract is not in a legal position to recover any interest in the policy proceeds.").  "For standing purposes, privity is established when the plaintiff proves the defendant was a party to an enforceable contract with either the plaintiff, or a third party who assigned its cause of action to the plaintiff." *Pagosa Oil & Gas, L.L.C. v. Marrs & Smith P'ship*, 323 S.W.3d 203, 210 (Tex. App.—El Paso 2010, pet. denied)

---

(2) the complaint raises a generalized grievance more properly addressed by the legislature, and (3) the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties. *St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533, 539 (5th Cir. 2009); *see also Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004). "Unlike a dismissal for lack of constitutional standing, which should be granted under Rule 12(b)(1), a dismissal for lack of prudential standing is properly granted under Rule 12(b)(6)." *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 (5th Cir. 2011).

[8]"It is a long-recognized principle that federal courts sitting in diversity cases 'apply state substantive law and federal procedural law.'" *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 417 (2010) (quoting *Hanna v. Plumer*, 380 U.S. 460, 465 (1965)). Here, the dispute concerns Texas insurance policies issued to Texas companies, and the alleged actions giving rise to Plaintiff's claims arose in whole or in part in Texas. (*See* docs. 63 at 1; *see De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1413 (5th Cir. 1995) (quoting *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984)) ("[T]he law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue."); *see also Faloona by Fredickson v. Hustler Magazine, Inc.*, 799 F.2d 1000, 1003 (5th Cir. 1986) (citing *Duncan*, 665 S.W.2d at 421) (contacts to take into account in determining the applicable law include the place of contracting and place of performance); *Escalon v. World Group Sec., Inc.*, No. 5:07-CV-214-C, 2008 WL 5572823, at *8 (N.D. Tex. Nov. 14, 2008) (citing *Lockheed*, 16 S.W.3d at 133-34) ("Under Texas law, the buying and selling corporations' purchase agreement's choice of law provision controls the applicability of successor liability doctrines.").  The parties do not dispute that Texas law applies.

(citation omitted); *see also First–Citizens Bank & Trust Co. v. Greater Austin Area Telecomms. Network*, 318 S.W.3d 560, 566 (Tex.App.—Austin 2010, no pet.) ("An assignee stands in the shoes of the assignor and may assert those rights that the assignor could assert, including bringing suit.").

"[A]n assignment is a contract between the assignor of a right and an assignee, who receives the authority to assert that right." *Pagosa Oil & Gas, L.L.C. v. Marrs & Smith P'ship*, 323 S.W.3d 203, 211 (Tex.App.–El Paso 2010, pet. denied). As a general rule, "an assignee takes all of the rights of the assignor, no greater and no less." *F.D.I.C. v. McFarland*, 243 F.3d 876, 887 n.42 (5th Cir. 2001) (citation omitted). "In other words, 'an assignee ... stands in the same position as its assignor stood.'" *Quality Infusion Care, Inc. v. Health Care Serv. Corp.*, 628 F.3d 725, 729 (5th Cir. 2010) (quoting *Houk v. Comm'r*, 173 F.2d 821, 825 (5th Cir. 1949)).

When deciding what rights, if any, have been assigned, courts "must 'examine and consider the entire writing and give effect to all provisions such that none are rendered meaningless.'" *Harris Methodist Fort Worth v. Sales Support Servs. Inc. Emp. Health Care Plan*, 426 F.3d 330, 334 (5th Cir. 2005). "In construing a written contract, the primary concern of the court is to ascertain and give effect to the parties' intentions as expressed in the instrument." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). "Contractual terms receive their ordinary and plain meaning unless the contract indicates the parties intended to give the terms a technical meaning." *Harris Methodist Fort Worth*, 426 F.3d at 334 (citation omitted). "Although contractual terms are read in accordance with their plain meaning, if a contract is ambiguous, due to its being 'subject to two or more reasonable interpretations,' extrinsic evidence may be considered." *Banco Popular, N. Am. v. Kanning*, 638 F. App'x 328, 334 (5th Cir. 2016) (citing *id.*).

Here, Plaintiff alleges that the claims based on the Paladin Policies were assigned to it under

the PSA, Assignment, and Sale Order. (doc. 63 at 2-4.) The PSA and Assignment provided that "Seller shall sell, convey and assign to Buyer and Buyer shall purchase, pay for, and accept all of Seller's right and title to, and interest in, and all privileges and obligations appurtenant to" the Property, including, among other things, "any interests related to insurance policies that may be in place to cover any liability outlined in or related to Buyer's obligations as set forth in Section 9.2, Section 9.3 and Section 9.4." (docs. 63-1 at 18-19; 63-3 at 2-3.)  Section 9.4, entitled "Buyer's Environmental Obligations," provides as follows:

> Upon and after Closing, and subject to Downward Adjustments as outlined herein, Buyer assumes full responsibility and liability for all occurrences, events, conditions, and activities on or related to the Property (the "Environmental Obligations"), regardless of whether arising from the ownership or operation of the Property before, on or after the Effective Date, and regardless of whether resulting from any acts or omissions of Seller (INCLUDING THOSE ARISING FROM SELLER'S SOLE, JOINT, CONCURRENT, OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT) or the condition of the Property when acquired, including but not limited to the following:
>
> (a) Environmental pollution or contamination, including pollution or contamination of the soil, groundwater or air by Hydrocarbons, drilling fluid or other chemicals, brine, produced water, NORM, or any other substance;
>
> (b) Underground injection activities and waste disposal on the Property;
>
> (c) Clean-up responses, and the cost of remediation, control, assessment or compliance with respect to surface and subsurface pollution caused by spills, pits, ponds, lagoons or subsurface storage tanks;
>
> (d) Non-compliance with applicable land use, surface disturbance, licensing or notification Laws or Orders;
>
> (e) Disposal on the Property of any hazardous substances, wastes, materials and products generated by or used in connection with the ownership or operation of the Property before, on or after the Effective Date; and
>
> (f)  Non-compliance with Environmental Laws.

11

(docs. 63-1 at 46-47; 63-3 at 9.)

The PSA and Assignment also provided that Paladin "shall sell, convey and assign to" Plaintiff all of its "right and title to, and interest in, and all privileges and obligations appurtenant to . . . [a]ll Claims arising from acts, omissions or events, or damage to or destruction of items following within this definition of the 'Property,' whether on or after the Effective Date, and all related rights, titles, claims and interests of [Paladin]." (docs. 63-1 at 19; 63-3 at 4.) The PSA defines a "Claim," in relevant part, as "a claim as such term is defined in Section 101(5) of the Bankruptcy Code, and any and all demands, losses, liabilities, damages, obligations, expenses, fines, penalties, costs, claims, causes of action and judgments for: (a) breaches of Contract; (b) loss or damage to property, injury to or death of persons (including illness and disease), and other tortious injury; or (c) violations of applicable Laws, Orders or any other legal right or duty actionable at law or equity." (doc. 63-1 at 11-12, ).  Section 101(5) of the Bankruptcy Code, in turn, states that a "Claim" includes both (A) the "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured" and (B) the "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured." 11 U.S.C. § 101(5).

As discussed, Spill B occurred at one of Paladin's disposal wells on June 11, 2017. (*See* doc. 63 at 5.) It meets the plain and ordinary meaning of an occurrence or event on or relating to Paladin's property that arose from the ownership or operation of that property "before, on or after the Effective Date, of May 1, 2017." (*See* docs. 63-1 at 46-47; 63-3 at 9.)  Because the PSA and

12

Assignment provide that "any interests related to insurance policies that may be in place to cover any liability outlined in or related to Buyer's obligations," and Spill B is included as one of the obligations assigned to Plaintiff under the agreements, the pleadings support the reasonable inference that Paladin's interests in the Paladin Policies were assigned to Plaintiff. (*See* docs. 63-1 at 18-19; 63-3 at 2-3.) Further, the causes of action based on the Paladin Policies that Plaintiff asserts appear to fall within the broad definition of the "Claims" assigned to it under the PSA and Assignment. (*See* docs. 63-1 at 11-12, 19; 63-3 at 4.)

Defendant argues that the Paladin Policies contain an anti-assignment clause "that voids any attempt to transfer rights under the policy without [its] consent." (doc. 71 at 16.) The anti-assignment clause provides, in part:

> **Assignments and Transfers**
> Neither you nor any other person or organization protected under your policy can assign, transfer, or otherwise turn over, your interest in it without consent from us in a written form that's made part of your policy.

(doc. 65-1 at 25.)

Anti-assignment clauses in insurance contracts are generally enforced by Texas courts. *See Nautilus Ins. Co. v. Concierge Care Nursing Centers, Inc.*, 804 F. Supp. 2d 557, 559 (S.D. Tex. 2011); *see also Conoco, Inc. v. Republic Ins. Co.*, 819 F.2d 120, 124 (5th Cir. 1987) ("Texas law permits the enforcement of no-assignment clauses in insurance policies."). "These clauses are enforceable unless rendered ineffective by an applicable statute, estoppel, waiver, or some other aspect of contract law." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Puget Plastics Corp.*, 649 F. Supp.2d 613, 623 (S.D. Tex. 2009), *aff'd by* 454 F. App'x 291 (5th Cir. 2011) (citing *Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 721 (Tex.App.–Dallas 2004, no pet.)).

Section 365(f)(1) of the Bankruptcy Code states, in relevant part, that "notwithstanding a

provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection." 11 U.S.C. § 365(f)(1). It permits a bankruptcy trustee to assume an executory contract and assign the contract "even where legal or contractual provisions would otherwise prohibit assignment." *Matter of Provider Meds, L.L.C.*, 907 F.3d 845, 851 (5th Cir. 2018) (citing *id.*). While the term "executory contract" is not defined in the Bankruptcy Code, the Fifth Circuit has concluded that " an agreement is executory if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party." *Matter of Murexco Petroleum, Inc.*, 15 F.3d 60, 62-63 (5th Cir. 1994) (citations omitted). "For purposes of the Bankruptcy Code, an insurance policy is a contract." *Charter Sch. Sols. v. GuideOne Mut. Ins. Co.*, 407 F. Supp. 3d 641, 647 (W.D. Tex. 2019) (citations omitted).

Here, the Sale Order entered by the Bankruptcy Court pursuant to "sections 105(a), 363, and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure" expressly approved the sale of Paladin's assets as described in the PSA (Assets), which included its interests in the Paladin Policies. (*See* Paladin Bankr., doc. 266 at 2, 7.) The order authorized and directed Paladin to "consummate the sale of the Assets, pursuant to and in accordance with the terms and conditions of the PSA including, without limitation, the conveyance of the Assets to the High Bidder and the assumption and assignment of the Assumed Contracts to be assumed in connection with the PSA." (*Id.* at 8.) It also provided that "the transfer and/or assignment of the Assets and the Assumed Contracts shall be effectuated on the terms set forth herein, and *shall not be restricted or prohibited, notwithstanding any alleged approval rights,*

14

*consent rights, preferential purchase rights, rights of purchase, rights of first refusal, rights of first offer, or similar rights with respect to the Debtor's transfer, sale vesting, assumption, and/or assignment of the Assets*, including the Assumed Contracts; and any counterparties to the Assumed Contracts shall be deemed to consent to and approve of the transfer, sale, vesting, assumption, and/or assignment of the Debtor's interests in the Assets, including the Assumed Contracts, by the Debtor." (*Id.* at 12 (emphasis added).) Because any restriction or prohibition on the assignment of the Assets, including the Paladin Policies, is expressly invalidated under the Sale Order, which was entered pursuant to § 365 of the Bankruptcy Code, the anti-assignment provisions in the Paladin Policies have been "rendered ineffective." *See Puget Plastics*, 649 F. Supp.2d at 623; *see also Safeco Ins. Co. of Am. v. Clear Vision Windshield Repair, LLC*, 564 S.W.3d 913, 919 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("Anti-assignment clauses are enforceable unless rendered ineffective by a statute or through the application of contract law.").  Accordingly, Plaintiff has met its burden to allege facts that give rise to a plausible claim of standing to assert claims under the Paladin Policies. *See Charter Sch. Sols.*, 407 F. Supp. 3d at 649 (finding assignee of insurance policy with a non-assignment clause had standing to sue under the policy when it was transferred to assignee during insured's bankruptcy proceedings). Defendant's motion to dismiss on standing grounds is denied.[9]

**B.**   **Breach of Contract Claim**

Defendant argues that Plaintiff's breach of contract claim under the Paladin Policies fails as a matter of law because no coverage is provided for Spill B. (doc. 71 at 19.)

The essential elements of a breach of contract claim in Texas are: (1) the existence of a valid

---

[9]In its response to the motion to dismiss, Plaintiff abandoned its argument that it is a "successor in interest" to Paladin, so it is not necessary to consider Defendant's challenge to standing on that basis. (*See* docs. 71 at 17; 82 at 6 n.2.)

contract; (2) breach of the contract by the defendant; (3) performance or tendered performance by the plaintiff; and (4) damages sustained by the plaintiff as a result of the defendant's breach. *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009) (citing *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App.–Houston [14th Dist.] 2005, pet. denied)). "A breach occurs when a party fails or refuses to do something he has promised to do." *Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). Under Texas law, the party seeking to recover for breach of an insurance contract bears the initial "burden of establishing coverage under the terms of the policy." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010). Once general coverage is established, the burden then shifts to the insurer to show that an exclusion applies and negates coverage. *JAW The Pointe, L.L.C. v. Lexington Ins.*, 460 S.W.3d 597, 603 (Tex. 2015). "If the insurer proves that an exclusion applies, the burden shifts back to the insured to show that an exception to the exclusion brings the claim back within coverage." *Gilbert*, 327 S.W.3d at 124. "In the context of a lawsuit seeking coverage under an insurance policy, dismissal is proper when the plain language of the policy precludes coverage." *Martin Res. Mgmt. Corp. v. Fed. Ins. Co.*, No. 20-40571, 2021 WL 4269565, at *2 (5th Cir. Sept. 20, 2021) (citing *IberiaBank Corp. v. Ill. Union Ins. Co.*, 953 F.3d 339, 348 (5th Cir. 2020)).

"Texas law provides that insurance policies are construed according to common principles governing the construction of contracts, and the interpretation of an insurance policy is a question of law for a court to determine." *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel L.L.C.*, 620 F.3d 558, 562 (5th Cir. 2010). The primary goal of the court is "to give effect to the written expression of the parties' intent." *Balandran v. Safeco Ins. Co. of America*, 972 S.W.2d 738, 741 (Tex. 1998). "Where the language of a contract is clear, a court's inquiry should begin and end with the policy's

language." *Nautilus Ins. Co.*, 566 F.3d at 455.  "Unless the policy dictates otherwise, [courts] give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage." *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 258 (Tex. 2017) (quoting *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015)). "When terms are defined in an insurance policy, those definitions control the interpretation of the policy." *TIG Ins. Co. v. San Antonio YMCA*, 172 S.W.3d 652, 658 (Tex. App.—San Antonio 2005, no pet.) (citing *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 823 (Tex. 1997). "Reliance on defined terms in insurance policies to construe those contracts is necessary to determine the intent of the parties and integral to the application of basic principles of contract interpretation to insurance policies." *Provident Life & Accident Ins. v. Knott*, 128 S.W.3d 211, 219 (Tex. 2003).

When construing the provisions of a policy, the court must "examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless." *Gilbert*, 327 S.W.3d at 126.  "[N]o one phrase, sentence, or section of a contract should be isolated from its setting and considered apart from the other provisions." *Nassar*, 508 S.W.3d at 257. "'Endorsements to a policy generally supersede and control over conflicting printed terms within the main policy;' however, the provisions found in the main 'policy and endorsement should be construed together unless' doing so would negate or render superfluous the additional coverage afforded in the endorsement." *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 115 (5th Cir. 2010) (quoting *Mesa Operating Co. v. Cal. Union Ins. Co.*, 986 S.W.2d 749, 754-55 (Tex. App.—Dallas 1999, pet. denied)). "An endorsement to an insurance policy controls the policy insofar as it enlarges, modifies, or restricts the terms of the policy, and if there is any conflict between the rider and the policy, the rider controls in construing the contract especially where the

17

provisions of the rider are more specific." *Penthouse Owners Ass'n, Inc. v. Certain Underwriters at Lloyds, London*, 612 F.3d 383, 386 (5th Cir. 2010) (quotations and citation omitted).

"If a contract as written can be given a clear and definite legal meaning, then it is not ambiguous as a matter of law." *JAW The Pointe*, 460 S.W.3d at, 603 (citation omitted). "Any disagreement about the meaning of the contract does not render it ambiguous; instead, the contract must be 'susceptible to two or more reasonable interpretations.'" *Tesoro Ref. & Mktg. Co., L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Penn.*, 833 F.3d 470, 474 (5th Cir. 2016) (quoting *American Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003)). "[A] contract is ambiguous only when the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning." *RSUI Indem.*, 466 S.W.3d at 119. "Where an ambiguity involves an exclusionary provision of an insurance policy, [the court] 'must adopt the construction ... urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.'" *Balandran*, 972 S.W.2d at 741 (quoting *Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991); *see Mid-Continent Cas. Co. v. Swift Energy Co.*, 206 F.3d 487, 491 (5th Cir. 2000) ("In Texas, when an insurance policy is ambiguous or inconsistent, the construction that would afford coverage to the insured must govern.").

Here, the CGL policy form of the Paladin Policies provides, in relevant part, as follows:

**What This Agreement Covers**

**Bodily injury and property damage liability.** We'll pay amounts any protected person is legally required to pay as damages for covered bodily injury or property damage that:
• happens while this agreement is in effect; and

18

• is caused by an event.

***

*Property damage* means:
• physical damage to tangible property of others, including all resulting loss of use of that property; or
• loss of use of tangible property of others that isn't physically damaged.

***

*Event* means an accident, including:
• continuous or repeated exposure to substantially the same general harmful conditions; and
• a sudden and accidental pollution incident.

***

**Pollution clean-up costs.** We'll pay amounts you voluntarily incur, or you or any other protected person is legally required to pay, for covered pollution clean-up costs that are incurred for a sudden and accidental pollution incident which:
• begins on a specific date and at a specific time while this agreement is in effect;
• results from your work or your completed work in the performance of your oil or gas operations, other than any work that is or was performed at, on, in, or from a waste site; and
• doesn't result from any intentional and willful violation of any governmental law, regulation, or rule by you or anyone acting on your behalf.

***

*Pollution work* means:
• the testing for, or monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing of, any pollutant; or
• the responding to, or assessing, in any way the effects of any pollutant.

*Pollutant* means any solid, liquid, gaseous, or thermal irritant or contaminant, including:
• smoke, vapors, soot, fumes;
• acids, alkalis, chemicals; and
• waste.

*Waste* includes materials to be recycled, reconditioned, or reclaimed.

But we won't consider waste to include:
• any substance produced from any well that results from your oil or gas operations, but only while such substance is located at, on, or in any premises, site, or location where such operations are being performed;
• any substance injected into any well to produce oil or gas in your oil or gas

19

operations, but only while such substance is located at, on, or in any premises, site, or location where such  operations  are being  performed; or
• glycol or any other machinery or equipment operating fluid that was used in your oil or gas operations, but only while such substance is handled or stored at, on, or in any premises, site, or location  where such operations are being performed.

For the purposes of this paragraph, your oil or gas operations doesn't include:
• the part of oil or gas lease or well operations that includes the ownership of any plugged and abandoned well; or
• any operations described as Your oil or gas operations in the Broadened Defined Meanings Table in the Coverage Summary.

*Your oil or gas operations* means any of the  following  operations,  including supporting operations for any of those operations, that are or were performed by or for you:
• Gasoline recovery from casing head or natural gas.
• Oil or gas lease or well operations.
• Cleaning, drilling, re-drilling, servicing, shooting, or swabbing of, or other operations performed on, oil or gas wells.
• Installation or recovery of casing in oil or gas wells.
• Installation, service, or repair of equipment, machinery, tanks, electrical or water lines, flowlines, or gathering lines, or site preparation or construction, at, on, in, or next to any oil or gas lease or well site for oil or gas lease or well operations at, on, or in such site.
• Described oil or gas pipeline operations.
• Geophysical exploration for oil or gas.
• Any operations described as Your oil or gas operations in the Broadened Defined Meanings Table in the Coverage Summary.

Your  oil  or  gas  operations  also  means  any  other  operations  that  are  or  were performed by or for you at, on, or in any oil or gas lease or well site for oil or gas lease or well operations there.

But we won't consider your oil or gas operations to include:
• the transporting, handling, storage, disposal, or processing of any pollutant; or
• pollution work;
unless such operations are or were performed at, on, in, or next to any premises, site, or location which:
• you rent or lease from others, own, or operate; or
• the lease or well operator operates.

***

*Oil or gas lease or well operations* means the ownership or operation of:
• any oil or gas lease or well; or

20

• any other well that's part of operations for any oil or gas lease or well.
***

*Pollution* means any actual, alleged, or threatened discharge, dispersal, escape, migration, release, or seepage of any pollutant.
***

*Waste pollutant* means any pollutant that is or was at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:
• any protected person; or
• any person or organization for whom any protected person may be legally responsible.
***

*Sudden and accidental pollution incident* means the discharge, escape, or release of a pollutant that:
• is sudden and accidental;
• is first known within 30 days of its beginning by you or any of your employees, your operating agent or any of its employees, your pumper-gauger or any of its employees, or any other applicable person or organization;
• any protected person, your operating agent, or your pumper-gauger attempts to end as soon as possible after it first becomes known by you or any of your employees, or your pumper-gauger or any of its employees; and
• is reported to us under this agreement within 90 days after it first becomes known to you or any of your employees, your operating agent or any of its employees, your pumper-gauger or any of its employees, or any other applicable person or organization.
***

## Exclusions - What This Agreement Won't Cover
***

**Pollution clean-up costs that result from your products.** We won't cover pollution clean-up costs that result from your products.

**Pollution injury or damage.** We won't cover injury or damage or medical expenses that result from pollution.

But we won't apply this exclusion to  bodily injury, property damage, or medical expenses that result from:
• building heating, air conditioning, or water heating equipment fumes, smoke, soot, or vapors;
• contractor or service work materials fumes, gases, or vapors;
• hostile fire heat, fumes, or smoke; or

21

• mobile equipment operating fluids.

Nor will we apply this exclusion to:
• bodily injury or property damage that results from your products or your completed work, other than waste products or completed work; or
• premises damage that results from fire.

Also, we won't apply this exclusion to bodily injury, property damage, or medical expenses that result from a sudden and accidental pollution incident which:
• begins on a specific date and at a specific time while this agreement is in effect;
• takes place at, on, in, or from a protected person's premises or protected person's worksite, other than any such premises or work site that's a waste site, or takes place in the course of described transportation operations being performed by or for you;
• doesn't involve any pollutant that's a waste pollutant at the time of its discharge, escape, or release;
• doesn't result from pollution work by or for any protected person or others unless such work qualifies as your oil or gas operations; and
• doesn't result from any intentional and willful violation of any governmental law, regulation, or rule by you or anyone acting on your behalf.

***

We'll consider all such bodily injury and property damage that results from a sudden and accidental pollution incident to happen at the time the sudden and accidental pollution incident begins, regardless of when such bodily injury or property damage actually happens.

***

**Pollution work loss, cost, or expense.** We won't cover any:
• loss, cost, or expense that results from any request, demand, order, or statutory or regulatory requirement that any protected person or others perform pollution work;
• cost or expense that's for pollution work; or
• loss, cost, or expense that results from any claim or suit by or for any governmental authority because of the performance of pollution work.

But we won't apply this exclusion to any costs or expenses that are pollution clean-up costs covered under the Pollution clean-up costs section of this agreement.

***

(docs. 65-4 at 15-18; 65-5 at 6, 17-18; 65-6 at 1-2.)

The CGL policy form is modified in relevant part by the DW and TPE Endorsements. (*See* docs. 65-6 at 16; 65-7 at 4.) The DW Endorsement provides:

22

**YOUR ABOVE-GROUND OPERATIONS FOR DISPOSAL WELLS ENDORSEMENT - OIL AND GAS COMMERCIAL GENERAL LIABILITY**

This endorsement changes your Oil And Gas Commercial General Liability Protection.

**How Coverage Is Changed**

There are four changes that are explained below. These changes broaden coverage.

1. The following replaces the second paragraph of the definition of your oil or gas operations in the Pollution clean-up costs section of the What This Agreement Covers section.

> Your oil or gas operations also means:
> • any other operations that are or were performed by or for you at, on, or in any oil or gas lease or well site for oil or gas lease or well operations there; and
> • your above-ground operations for disposal wells.
>
> *Your above-ground operations for disposal wells* means operations above the surface of the ground or water bottom that are:
> • the handling of, or transportation by pipeline of, any described substance for the purposes of its disposal in a disposal well; and
> • being performed before such disposal happens.
>
> *Described substance* means any substance produced from any well that's part of:
> • the oil or gas lease or well operations of another if the disposal operations are being performed at, on, or in any premises, site, or location that you rent or lease from others, or own; or
> • your oil or gas lease or well operations if the disposal operations are being performed by or for you at, on, or in any premises, site, or location that you don't rent or lease from others, or own.

2. The following is added to the third paragraph of the definition of your oil or gas operations in the Pollution clean-up costs section of the What This Agreement Covers section.

> However, we won't apply this paragraph to your above-ground operations for disposal wells.

3. The following is added to what we consider waste to not include in the Pollution clean-up costs section of the What This Agreement Covers section.

23

Nor will we consider waste to include any described substance before its disposal in a disposal well as part of your above-ground operations for disposal wells.

4. The following replaces the fourth paragraph of the Pollution injury or damage exclusion, but only for this endorsement.

Also, we won't apply this exclusion to bodily injury, property damage, or medical expenses that result from a sudden and accidental pollution incident which:
• begins on a specific date and on a specific time while this agreement is in effect;
• takes place at, on, in, or from any premises, site, or location where your above-ground operations for disposal wells are being performed, other than any such premises site, or location you rent, lease from others, or own, that's a waste site;
• doesn't involve any pollutant that's a waste pollutant at the time of its discharge, escape, or release;
• doesn't result from pollution work by or for any protected person or others unless such work qualifies as your above-ground operations for disposal wells; and
• doesn't result from any intentional and willful violation of any governmental law, regulation, or rule by you or anyone acting on your behalf.

**Other Terms**

All other terms of your policy remain the same.

(doc. 65-6 at 16.)

The TPE Endorsement provides as follows:

**TOTAL POLLUTION INJURY OR DAMAGE AND POLLUTION CLEAN-UP COSTS EXCLUSION ENDORSEMENT - OIL AND GAS COMMERCIAL GENERAL LIABILITY**

This endorsement changes your Oil And Gas Commercial General Liability Protection.

**How Coverage Is Changed**

There are four changes that are explained below. These changes exclude coverage.

1. The following replaces what we consider waste to include and not to include in the

24

Pollution clean-up costs section of the What This Agreement Covers section.

> *Waste* includes materials to be recycled, reconditioned, or reclaimed.

2. The following replaces the Pollution clean-up costs that result from your products exclusion.

> **Pollution clean-up costs.** We won't cover pollution clean-up costs.

3. The following replaces the Pollution injury or damage exclusion.

> **Pollution injury or damage.** We won't cover injury or damage or medical expenses that result from pollution.

4. The following replaces the Pollution work loss, cost, or expense exclusion.

> **Pollution work loss, cost, or expense.** We won't cover any:
> • loss, cost, or expense that results from any request, demand, order, or statutory or regulatory requirement that any protected person or others perform pollution work;
> • cost or expense that's for pollution work; or
> • loss, cost, or expense that results from any claim or suit by or for any governmental authority because of the performance of pollution work.

> For example:

> *A chemical spill at your manufacturing facility releases a vapor cloud. Several people are exposed to the vapor cloud before it disappears. None of them sustain any apparent bodily injury. However, some of them demand that you arrange and pay for medical checkups now, and yearly for the next ten years, to assess the effect of the vapor cloud on their health. We won't cover the cost of such pollution work, regardless of who orders or performs it.*

**Other Terms**

All other terms of your policy remain the same.

(doc. 65-7 at 4.)

Plaintiff alleges that Spill B occurred during above-ground operations at Paladin's disposal well site when the Paladin Policies were in effect. (*See* doc. 63 at 10, 14.) It alleges that the spill is covered by the "Bodily injury and property damage liability" provision, which pays for "property

damage" caused by a "sudden and accidental pollution incident," and by the "Pollution clean-up costs" provision, which pays for "pollution clean-up costs" incurred for a "sudden and accidental pollution incident" that results from "your work or your completed work in the performance of your oil or gas operations." (*Id* at 8-9.) It also alleges that coverage for Spill B also falls under the "Above-Ground Operations for Disposal Wells" endorsement, which broadens coverage under the CGL policy form to include "your above-ground operations for disposal wells." (*Id.* at 10-11.) These allegations are sufficient to raise a reasonable inference that coverage for Spill B is provided under the Paladin Policies. *See Gilbert*, 327 S.W.3d at 124 ("Initially, the insured has the burden of establishing coverage under the terms of the policy.").

Defendant argues that the Paladin Policies contain total pollution exclusions that exclude coverage for "pollution events" like Spill B. (doc. 71 at 19.) It points to the TPE Endorsement, which states that it includes changes to the CGL policy that "exclude coverage." (*See* doc. 65-7 at 4.) The TPE Endorsement narrows the scope of coverage under the CGL policy by removing the exceptions to the definition of "waste," which, in turn, limits the types of substances that are covered as part of "your oil and gas operations." (*See* docs. 64-4 at 16; 65-7 at 4.)  It expands the scope of exclusions under the CGL policy by removing the exceptions contained in the "Pollution clean-up costs," "Pollution injury or damage," and "Pollution work loss, cost, or expense" exclusions, which eliminates the limited coverage for pollution under the CGL policy. (*See* docs. 65-5 at 17-18; 65-6 at 1-2; 65-7 at 4.)

When the Paladin Policies are read in their entirety, the TPE Endorsement directly conflicts with the WD Endorsement. *See RSUI Indem.*, 466 S.W.3d at 119. Both endorsements state that "All other terms of your policy remain the same." (*See* docs. 65-6 at 16; 65-7 at 4.) The plain language

in the WD Endorsement broadens coverage for above-ground operations for disposal wells under the "Bodily injury and property damage liability" and "Pollution clean-up costs" provisions in the CGL policy form by adding "your above-ground operations for disposal wells" to the definition of "your oil or gas operations" in the coverage section, and by adding "your above ground operations for disposal wells" to the exceptions to the "Pollution injury or damage" exclusion. (*See* docs. 65-4 at 15-17; 65-5 at 17-18; 65-6 at 16.) As discussed, the TPE Endorsement removes most of the exceptions to the "Pollution injury or damage" exclusion in the CGL policy form, including an exception for a "sudden and accidental pollution incident." (*See* docs. 65-5 at 17-18; 65-7 at 4.) Moreover, the endorsements make different changes to the same defined term in the CGL policy form: the WD Endorsement modifies the definition of "waste" under the coverage section by adding another exception for waste, while the TPE Endorsement modifies the same term by eliminating all exceptions for waste. (*See* docs. 65-4 at 16; 65-5 at 17-18; 65-6 at 16.)

If the TPE Endorsement receives controlling effect, as argued by Defendant, it renders the WD Endorsement meaningless. *See Big Binder Express, L.L.C. v. Liberty Mut. Fire Ins. Co.*, 843 F. App'x 548, 553 (5th Cir. 2021) (rejecting interpretation of policy that would render an endorsement meaningless because it would be "unreasonable for an insured that agreed to an endorsement to think that the endorsement has no effect"). As explained, courts must read all parts of the policy together, and give "effect to each word, clause, and sentence, and avoid making any provision within the policy inoperative." *State Farm Lloyds v. Page*, 315 S.W.3d 525, 527 (Tex. 2010).  When, as here, an endorsement narrowing coverage creates ambiguity by conflicting with an endorsement expanding coverage, the construction that affords coverage to the insured governs. *See Valmont Energy Steel, Inc. v. Commercial Union Ins. Co.*, 359 F.3d 770, 774 (5th Cir. 2004) ("If

the court finds an ambiguity in the contract provisions, particularly in an exclusion clause, the court should construe the policy strictly against the insurer."); *see also Terry Black's Barbecue, L.L.C. v. State Auto. Mut. Ins. Co.*, No. 21-50078, 2022 WL 43170, at *3 (5th Cir. Jan. 5, 2022) ("When an insurance policy is ambiguous, and the parties offer conflicting reasonable interpretations of the policy, Texas law favors adopting the interpretation in favor of the insured."). Because the exclusions modified by the TPE Endorsement are inconsistent with the modified terms broadening coverage under the WD Endorsement, and the interaction among these endorsements makes the Paladin Policies ambiguous as a matter of law, the Court must adopt the reasonable interpretation of the policies that favors coverage. *See INA of Tex. v. Leonard*, 714 S.W.2d 414, 417 (Tex. App.—San Antonio 1986, writ ref'd n.r.e.) (resolving ambiguity between conflicting endorsements in favor of insured, where one endorsement excluded coverage and a subsequent endorsement provided coverage); *see, e.g., Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 559 (5th Cir. 2004) (finding Saline Endorsement to CGL policy that increased the amount payable to insureds on a coverage claim provided coverage, as insurer's arguments for limiting coverage under a Pollution Exclusion and Pollution Endorsement "would render the entire Saline Endorsement meaningless because essentially everything covered by the endorsement would necessarily be excluded by the Pollution Exclusion clause"). Plaintiff has adequately alleged that Spill B is covered under the "Bodily injury and property damage liability" and "Pollution clean-up costs" provisions, as modified by the WD Endorsement, of the Paladin Policies, and therefore states a plausible claim for breach of contract. Defendant's motion to dismiss this breach of contract claim is denied.

## C.     **Bad Faith Claims**

Defendant argues that Plaintiff fails to allege a bad faith claim on which relief may be

granted as to the Paladin Policies. (doc. 71 at 20.)

Under Texas law, "the duty of good faith and fair dealing emanates from the special relationship between the parties and not the terms of the contract." *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 697-98 (Tex. 1994). "[T]he 'special relationship' exists only because the insured and the insurer are parties to a contract that is the result of unequal bargaining power, and by its nature allows unscrupulous insurers to take advantage of their insureds." *Id.* at 689. An insurer breaches its common-law duty of good faith and fair dealing when "there is no reasonable basis for [its] denial of a claim or delay in payment or a failure on the part of the insurer to determine whether there is any reasonable basis for the denial or delay." *Arnold v. Nat'l County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987), *modified on other grounds by Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826 (Tex. 1990). "Similar to that common-law duty, the Insurance Code supplements the parties' contractual rights and obligations by imposing procedural requirements that govern the manner in which insurers review and resolve an insured's claim for policy benefits." *USAA Texas Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 488 (Tex. 2018). "Liability under § 541 of the Texas Insurance Code is analyzed under the same standard as common-law bad faith claims." *Rapid Tox Screen LLC v. Cigna Healthcare of Texas Inc.*, No. 3:15-CV-3632-B, 2017 WL 3658841, at *14 (N.D. Tex. Aug. 24, 2017) (citing *Hamilton Props. v. Am. Ins. Co.*, 643 F. App'x 437, 442 (5th Cir. 2016)). Under Texas law, a plaintiff cannot bring suit for violations of § 541 "absent privity of contract or some sort of reliance by the person bringing a claim on the words or deeds of the insurer." *Warfield v. Fid. & Deposit Co.*, 904 F.2d 322, 327 (5th Cir. 1990) (referring to Tex. Ins. Code Ann. Art. 21.21, § 16(a), now recodified under Tex. Ins. Code § 541.151) (citations omitted).

Here, Plaintiff alleges that it, "as Paladin's assignee . . . , stands in the shoes of Paladin for

purposes of Paladin's bad faith claims." (doc. 63 at 15.) It claims that Defendant "breached its duty of good faith and fair dealing through its conduct in adjusting the Spill B claim" because it "denied any further duty to indemnify Paladin or Pogo for the [claim]," even though it "knew it was liable for the first-party clean-up and remediation costs under the Pogo and Paladin Policies." (*Id.*) It also alleges that Defendant breached its obligations under Section 541 of the Texas Insurance Code by:

> • Misrepresenting material facts and policy provisions related to coverage available for Spill B;
>
> • Failing to attempt in good faith to reach a prompt and fair settlement with the Pearce Trust when Pogo's liability to clean-up Spill B was reasonably clear;
>
> • Failing to promptly provide a reasonable explanation of the basis for Travelers' denial of the Spill B claim;
>
> • Failing to deny coverage within a reasonable period of time; and
>
> • Refusing to pay the Spill B claim without conducting a reasonable investigation.

(*Id.* at 15-16.)

Defendant argues that Plaintiff's common law bad faith claim under the Paladin Policies fails as a matter of law because there is no "special relationship" between it and Plaintiff under the policies. (doc. 71 at 20.) It also argues that Plaintiff's bad faith claim under § 541 of the Texas Insurance Code fails as a matter of law because such claims are "personal and punitive" and "unassignable," and because it cannot show Paladin's reliance on any misrepresentations regarding the policies or coverage denial, or how it sustained pecuniary loss as a result. (*Id.* at 21-22.) As discussed, Plaintiff alleges that Paladin assigned its interests in the Paladin Policies to it. Plaintiff's common law bad faith claims under the Paladin Policies, as alleged in the Second Amended Complaint, are based on Plaintiff's "special relationship" with Defendant that formed when Paladin assigned its interests in the policies to Plaintiff. *See Natividad*, 875 S.W.2d at 697-98; *see also*

*Crawford v. GuideOne Mut. Ins. Co.*, 420 F. Supp. 2d 584, 599 (N.D. Tex. 2006) ("Any breach of the duty to defend under the Policy to a proper insured cannot be advanced by Plaintiff absent an assignment of rights."); *Texas Gen. Hosp., LP v. United Healthcare Servs., Inc.*, No. 3:15-CV-02096-M, 2016 WL 3541828, at *12 (N.D. Tex. June 28, 2016) ("For the same reasons Plaintiffs have standing to bring a breach of contract claim, Plaintiffs also have standing to bring an action for the insurers' alleged breach of the duty of good faith and fair dealing pursuant to that contractual relationship."). While "statutory remedies under the Texas Insurance Code are personal and punitive in nature and the Insurance Code makes no provision for assignability," *Am. S. Ins. Co. v. Buckley*, 748 F. Supp. 2d 610, 226 (E.D. Tex. 2010), Plaintiff has alleged privity of contract with Defendant as the assignee of the Paladin Policies, and the alleged violations of the Texas Insurance Code are based on Defendant's conduct when it was in privity with Plaintiff under the policies. Whether Plaintiff can show reliance and loss based on misrepresentations by Defendant is a material fact issue best left for summary judgment determination. Plaintiff's Second Amended Complaint alleges a plausible basis of independent standing to pursue bad faith claims under the Paladin Policies, and includes sufficient allegations of how Defendant breached its common-law duty of good faith and violated the Texas Insurance Code after privity had been established between it and Plaintiff. *See Gilmour v. Blue Cross & Blue Shield of Alabama*, No. 4:19-CV-160, 2020 WL 2813197, at *17-18 (E.D. Tex. May 29, 2020), *order vacated in part on other grounds by* 2021 WL 1196272 (E.D. Tex. Mar. 30, 2021) (denying insurer's motion to dismiss claim for breach of the duty of good faith and fair dealing because plaintiff was the assignee of the insureds' rights under their policies and had standing to assert the claim); *see Rapid Tox Screen LLC v. Cigna Healthcare of Texas Inc.*, No. 3:15-CV-3632-B, 2017 WL 3658841, at *14 (N.D. Tex. Aug. 24, 2017) (denying

motion to dismiss a claim for bad faith insurance practices under the Texas Insurance Code brought by the assignee of rights under insurance plans). Defendant's motion to dismiss the bad faith claims is denied.

### III.  CONCLUSION

Defendant's motion for judgment on the pleadings is **DENIED**.

**SO ORDERED** this 24th day of January, 2022.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

32