IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| POGO RESOURCES, LLC, | § | |
| **Plaintiff,** | § | |
| | § | **Civil Action No. 3:19-CV-2682-BH** |
| v. | § | |
| | § | |
| ST. PAUL FIRE AND MARINE | § | |
| INSURANCE COMPANY, A MEMBER | § | |
| COMPANY OF THE TRAVELERS | § | |
| GROUP OF INSURERS, | § | |
| **Defendant.** | § | **Consent Case**[1] |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Before the Court is *Defendant St. Paul Fire and Marine Insurance Company's Motion for Partial Summary Judgment*, filed July 14, 2021 (doc. 72), and *Plaintiff's Affirmative Motion for Partial Summary Judgment on its Declaratory Judgment and Breach of Contract Claims*, filed July 14, 2021 (doc. 75).  Based upon the relevant filings and applicable law, both motions are **DENIED in part** and **GRANTED in part**.

## I.  BACKGROUND

This is an insurance coverage dispute between Pogo Resources, LLC (Plaintiff), a Texas oil and gas company, and St. Paul Fire and Marine Insurance Company (Defendant). (*See* doc. 63.)[2]

### A.    <u>Insurance Policies</u>

Defendant issued Plaintiff commercial general liability (CGL) and umbrella excess protection (Umbrella) insurance policies for its oil and gas operations, effective from March 1, 2017 to March 1, 2018 (collectively Pogo Policy). (docs. 74-3; 74-4; 77-1 at 87-150; 77-2.) Paladin

---

[1]By consent of the parties and the order of transfer dated January 29, 2020, this case has been transferred for the conduct of all further proceedings and the entry of judgment.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

Energy Corporation (Paladin) was a Dallas-based oil and gas company that owned and operated oil and gas assets in Texas and New Mexico. (docs. 63 at 2; 65 at 2.) Defendant separately issued Paladin CGL and Umbrella insurance policies for its oil and gas operations, effective July 1, 2016 to July 1, 2017 (collectively Paladin Policy). (docs. 74-1; 74-2; 77 at 8-149; 77-1 at 1-85.) The Pogo and Paladin policies generally provide the named insured coverage for, among other things, bodily injury and property damage and pollution clean-up costs. (docs. 74-1 at 85-88; 74-2 at 35-38; 74-3 at 115-18; 74-4 at 48-51; 77 at 91-94; 77-1 at 34-37; 77-2 at 24-27, 105-08).  The main forms of the Pogo Policy are identical to the main forms of the Paladin Policy.[3]  (docs. 74-1 at 84-121; 74-3 at 115-48; 74-4 at 1-3; 77-2 at 24-60; 77 at 90-127.)  Both provide, in relevant part:

**What This Agreement Covers**

**Bodily injury and property damage liability.** We'll pay amounts any protected person is legally required to pay as damages for covered bodily injury or property damage that:
• happens while this agreement is in effect; and
• is caused by an event.
***

*Property damage* means:
• physical damage to tangible property of others, including all resulting loss of use of that property; or
• loss of use of tangible property of others that isn't physically damaged.
***

*Event* means an accident, including:
• continuous or repeated exposure to substantially the same general harmful conditions; and
• a sudden and accidental pollution incident.
***

**Pollution clean-up costs.** We'll pay amounts you voluntarily incur, or you or any

---

[3]Even though there is a separate main form for the CGL policy and the Umbrella policy, the policies have the same or substantially similar provisions and terms. (*Compare* docs. 74-1 at 84-121; 74-3 at 115-48; 77 at 90-127; 77-2 at 24-60 *with* docs. 74-2 at 30-83; 74-4 at 43-93; 77-1 at 29-82; 77-2 at 102-50.)

other protected person is legally required to pay, for covered pollution clean-up costs that are incurred for a sudden and accidental pollution incident which:
• begins on a specific date and at a specific time while this agreement is in effect;
• results from your work or your completed work in the performance of your oil or gas operations, other than any work that is or was performed at, on, in, or from a waste site; and
• doesn't result from any intentional and willful violation of any governmental law, regulation, or rule by you or anyone acting on your behalf.

***

*Pollution work* means:
• the testing for, or monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing of, any pollutant; or
• the responding to, or assessing, in any way the effects of any pollutant.

*Pollutant* means any solid, liquid, gaseous, or thermal irritant or contaminant, including:
• smoke, vapors, soot, fumes;
• acids, alkalis, chemicals; and
• waste.

*Waste* includes materials to be recycled, reconditioned, or reclaimed.

But we won't consider waste to include:
• any substance produced from any well that results from your oil or gas operations, but only while such substance is located at, on, or in any premises, site, or location where such operations are being performed;
• any substance injected into any well to produce oil or gas in your oil or gas operations, but only while such substance is located at, on, or in any premises, site, or location where such operations are being performed; or
• glycol or any other machinery or equipment operating fluid that was used in your oil or gas operations, but only while such substance is handled or stored at, on, or in any premises, site, or location where such operations are being performed.

For the purposes of this paragraph, your oil or gas operations doesn't include:
• the part of oil or gas lease or well operations that includes the ownership of any plugged and abandoned well; or
• any operations described as Your oil or gas operations in the Broadened Defined Meanings Table in the Coverage Summary.

*Your oil or gas operations* means any of the following operations, including supporting operations for any of those operations, that are or were performed by or for you:
• Gasoline recovery from casing head or natural gas.

3

• Oil or gas lease or well operations.
• Cleaning, drilling, re-drilling, servicing, shooting, or swabbing of, or other operations performed on, oil or gas wells.
• Installation or recovery of casing in oil or gas wells.
• Installation, service, or repair of equipment, machinery, tanks, electrical or water lines, flowlines, or gathering lines, or site preparation or construction, at, on, in, or next to any oil or gas lease or well site for oil or gas lease or well operations at, on, or in such site.
• Described oil or gas pipeline operations.
• Geophysical exploration for oil or gas.
• Any operations described as Your oil or gas operations in the Broadened Defined Meanings Table in the Coverage Summary.

Your oil or gas operations also means any other operations that are or were performed by or for you at, on, or in any oil or gas lease or well site for oil or gas lease or well operations there.

But we won't consider your oil or gas operations to include:
• the transporting, handling, storage, disposal, or processing of any pollutant; or
• pollution work;
unless such operations are or were performed at, on, in, or next to any premises, site, or location which:
• you rent or lease from others, own, or operate; or
• the lease or well operator operates.
***

*Oil or gas lease or well operations* means the ownership or operation of:
• any oil or gas lease or well; or
• any other well that's part of operations for any oil or gas lease or well.
***

*Pollution* means any actual, alleged, or threatened discharge, dispersal, escape, migration, release, or seepage of any pollutant.
***

*Waste pollutant* means any pollutant that is or was at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:
• any protected person; or
• any person or organization for whom any protected person may be legally responsible.
***

*Sudden and accidental pollution incident* means the discharge, escape, or release of a pollutant that:

4

• is sudden and accidental;

• is first known within 30 days of its beginning by you or any of your employees, your operating agent or any of its employees, your pumper-gauger or any of its employees, or any other applicable person or organization;

• any protected person, your operating agent, or your pumper-gauger attempts to end as soon as possible after it first becomes known by you or any of your employees, or your pumper-gauger or any of its employees; and

• is reported to us under this agreement within 90 days after it first becomes known to you or any of your employees, your operating agent or any of its employees, your pumper-gauger or any of its employees, or any other applicable person or organization.

***

**Exclusions - What This Agreement Won't Cover**
***

**Pollution clean-up costs that result from your products.** We won't cover pollution clean-up costs that result from your products.

**Pollution injury or damage.** We won't cover injury or damage or medical expenses that result from pollution.

But we won't apply this exclusion to  bodily injury, property damage, or medical expenses that result from:

• building heating, air conditioning, or water heating equipment fumes, smoke, soot, or vapors;

• contractor or service work materials fumes, gases, or vapors;

• hostile fire heat, fumes, or smoke; or

• mobile equipment operating fluids.

Nor will we apply this exclusion to:

• bodily injury or property damage that results from your products or your completed work, other than waste products or completed work; or

• premises damage that results from fire.

Also, we won't apply this exclusion to bodily injury, property damage, or medical expenses that result from a sudden and accidental pollution incident which:

• begins on a specific date and at a specific time while this agreement is in effect;

• takes place at, on, in, or from a protected person's premises or protected person's worksite, other than any such premises or work site that's a waste site, or takes place in the course of described transportation operations being performed by or for you;

• doesn't involve any pollutant that's a waste pollutant at the time of its discharge, escape, or release;

• doesn't result from pollution work by or for any protected person or others unless

5

such work qualifies as your oil or gas operations; and
• doesn't result from any intentional and willful violation of any governmental law, regulation, or rule by you or anyone acting on your behalf.

***

We'll consider all such bodily injury and property damage that results from a sudden and accidental pollution incident to happen at the time the sudden and accidental pollution incident begins, regardless of when such bodily injury or property damage actually happens.

***

**Pollution work loss, cost, or expense.** We won't cover any:
• loss, cost, or expense that results from any request, demand, order, or statutory or regulatory requirement that any protected person or others perform pollution work;
• cost or expense that's for pollution work; or
• loss, cost, or expense that results from any claim or suit by or for any governmental authority because of the performance of pollution work.

But we won't apply this exclusion to any costs or expenses that are pollution clean-up costs covered under the Pollution clean-up costs section of this agreement.

***

(docs. 74-1 at 84-121; 74-3 at 115-48; 74-4 at 1-3; 77-2 at 24-60; 77 at 90-127.)[4]

The Pogo and Paladin Policies contain various endorsements that alter coverage by modifying the provisions of each policy's main forms. (docs. 74-1 at 122-38; 74-4 at 4-19; 77 at 128-44; 77-2 at 61-76.)  As relevant, both policies contain an endorsement that broadens coverage for above-ground operations for disposal wells (DW Endorsement). (docs. 74-1 at 127; 74-4 at 8; 77 at 133; 77-2 at 65.)  The DW Endorsement provides:

**YOUR ABOVE-GROUND OPERATIONS FOR DISPOSAL WELLS**

---

[4]Both policies also contain an anti-assignment clause that provides, in part:

**Assignments and Transfers**
Neither you nor any other person or organization protected under your policy can assign, transfer, or otherwise turn over, your interest in it without consent from us in a written form that's made part of your policy.

(docs. 74-1 at 13; 74-3 at 20; 77 at 19; 77-1 at 105.)

6

**ENDORSEMENT - OIL AND GAS COMMERCIAL GENERAL LIABILITY**

This endorsement changes your Oil And Gas Commercial General Liability Protection.

**How Coverage Is Changed**

There are four changes that are explained below. These changes broaden coverage.

1. The following replaces the second paragraph of the definition of your oil or gas operations in the Pollution clean-up costs section of the What This Agreement Covers section.

> Your oil or gas operations also means:
> • any other operations that are or were performed by or for you at, on, or in any oil or gas lease or well site for oil or gas lease or well operations there; and
> • your above-ground operations for disposal wells.
>
> *Your above-ground operations for disposal wells* means operations above the surface of the ground or water bottom that are:
> • the handling of, or transportation by pipeline of, any described substance for the purposes of its disposal in a disposal well; and
> • being performed before such disposal happens.
>
> *Described substance* means any substance produced from any well that's part of:
> • the oil or gas lease or well operations of another if the disposal operations are being performed at, on, or in any premises, site, or location that you rent or lease from others, or own; or
> • your oil or gas lease or well operations if the disposal operations are being performed by or for you at, on, or in any premises, site, or location that you don't rent or lease from others, or own.

2. The following is added to the third paragraph of the definition of your oil or gas operations in the Pollution clean-up costs section of the What This Agreement Covers section.

> However, we won't apply this paragraph to your above-ground operations for disposal wells.

3. The following is added to what we consider waste to not include in the Pollution clean-up costs section of the What This Agreement Covers section.

Nor will we consider waste to include any described substance before its disposal in a disposal well as part of your above-ground operations for disposal wells.

4. The following replaces the fourth paragraph of the Pollution injury or damage exclusion, but only for this endorsement.

Also, we won't apply this exclusion to bodily injury, property damage, or medical expenses that result from a sudden and accidental pollution incident which:
• begins on a specific date and on a specific time while this agreement is in effect;
• takes place at, on, in, or from any premises, site, or location where your above-ground operations for disposal wells are being performed, other than any such premises site, or location you rent, lease from others, or own, that's a waste site;
• doesn't involve any pollutant that's a waste pollutant at the time of its discharge, escape, or release;
• doesn't result from pollution work by or for any protected person or others unless such work qualifies as your above-ground operations for disposal wells; and
• doesn't result from any intentional and willful violation of any governmental law, regulation, or rule by you or anyone acting on your behalf.

**Other Terms**

All other terms of your policy remain the same.

(*Id.*)[5]

The Paladin Policy contains an endorsement that excludes coverage for total pollution injury or damage and pollution clean-up costs (TPE Endorsement). (docs. 74-1 at 137; 77 at 143.)  It provides:

**TOTAL POLLUTION INJURY OR DAMAGE AND POLLUTION CLEAN-UP COSTS EXCLUSION ENDORSEMENT - OIL AND GAS COMMERCIAL GENERAL LIABILITY**

---

[5]The similar endorsement in the Umbrella policies is entitled YOUR ABOVE-GROUND OPERATIONS FOR DISPOSAL WELLS ENDORSEMENT - OIL AND GAS UMBRELLA EXCESS LIABILITY. (docs. 74-2 at 80; 74-4 at 89; 77-1 at 79; 77-2 at 146.)

This endorsement changes your Oil And Gas Commercial General Liability Protection.

**How Coverage Is Changed**

There are four changes that are explained below. These changes exclude coverage.

1. The following replaces what we consider waste to include and not to include in the Pollution clean-up costs section of the What This Agreement Covers section.

> *Waste* includes materials to be recycled, reconditioned, or reclaimed.

2. The following replaces the Pollution clean-up costs that result from your products exclusion.

> **Pollution clean-up costs.** We won't cover pollution clean-up costs.

3. The following replaces the Pollution injury or damage exclusion.

> **Pollution injury or damage.** We won't cover injury or damage or medical expenses that result from pollution.

4. The following replaces the Pollution work loss, cost, or expense exclusion.

> **Pollution work loss, cost, or expense.** We won't cover any:
> • loss, cost, or expense that results from any request, demand, order, or statutory or regulatory requirement that any protected person or others perform pollution work;
> • cost or expense that's for pollution work; or
> • loss, cost, or expense that results from any claim or suit by or for any governmental authority because of the performance of pollution work.

> For example:

> *A chemical spill at your manufacturing facility releases a vapor cloud. Several people are exposed to the vapor cloud before it disappears. None of them sustain any apparent bodily injury. However, some of them demand that you arrange and pay for medical checkups now, and yearly for the next ten years, to assess the effect of the vapor cloud on their health. We won't cover the cost of such pollution work, regardless of who orders or performs it.*

**Other Terms**

All other terms of your policy remain the same.

9

(*Id.*)[6]

**B.      Sale of Paladin Assets**

On April 21, 2016, Paladin filed for Chapter 11 bankruptcy in the United States Bankruptcy

Court for the Northern District of Texas. *See In re Paladin Energy Corp.*, No. 16-31590-bjh-11

(N.D. Tex. Bank.) (Paladin Bankr.).  Throughout the bankruptcy, it continued to operate its business

and to manage its bankruptcy estate as debtor-in-possession. (*See* Paladin Bankr., doc. 1.)  In

February 2017, saltwater spills occurred at two of its well sites in New Mexico (collectively Spill

A). (docs. 63 at 4; 65 at 4.)  The New Mexico Oil Conservation Division (NMOCD) assigned a

release remediation permit for Spill A, and Paladin filed a claim with Defendant for coverage under

the Paladin Policy for the costs associated with responding to Spill A. (docs. 63 at 4-5; 65 at 4.)

On May 15, 2017, Paladin and Plaintiff executed a Stalking Horse Purchase and Sale

Agreement (PSA), effective May 1, 2017, for the purchase of substantially all of Paladin's oil and

gas property (collectively the Property). (docs. 74-8; 77-3 at 33-155.)  The PSA set forth the terms

and conditions of the sale and assignment of the Property to Plaintiff, including, in part, that the

parties would seek an order from the bankruptcy court "authorizing and approving the Sale

Transaction Free and Clear (except for Permitted Encumbrances and Buyer's Assumed Obligations,

including the assumption and assignment of certain executory contracts and unexpired leases,

pursuant to Sections 105, 363 and 365 of the Bankruptcy Code." (docs. 74-8 at 10; 77-3 at 41.)  It

provides that "Seller shall sell, convey and assign to Buyer and Buyer shall purchase, pay for, and

accept all of Seller's right and title to, and interest in, and all privileges and obligations appurtenant

---

[6]The similar endorsement in the Umbrella policy is entitled TOTAL POLLUTION INJURY OR DAMAGE
AND POLLUTION CLEAN-UP COSTS EXCLUSION ENDORSEMENT - WITH EXCEPTION FOR CERTAIN
BODILY INJURY, PROPERTY DAMAGE, POLLUTION COST OR EXPENSE RELATED TO AUTOS - OIL AND
GAS UMBRELLA EXCESS LIABILITY. (docs. 74-2 at 74-75; 77-1 at 73-74.)

to" the Property, including, among other things, "any interests related to insurance policies that may

be in place to cover any liability outlined in or related to Buyer's obligations as set forth in Section

9.2, Section 9.3 and Section 9.4." (docs. 74-8 at 18-19; 77-3 at 49-50.)  Section 9.4, entitled

"Buyer's Environmental Obligations," states:

> Upon and after Closing, and subject to Downward Adjustments as outlined herein, Buyer assumes full responsibility and liability for all occurrences, events, conditions, and activities on or related to the Property (the "Environmental Obligations"), regardless of whether arising from the ownership or operation of the Property before, on or after the Effective Date, and regardless of whether resulting from any acts or omissions of Seller (INCLUDING THOSE ARISING FROM SELLER'S SOLE, JOINT, CONCURRENT, OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT) or the condition of the Property when acquired, including but not limited to the following:
>
> > (a)  Environmental pollution or contamination, including pollution or contamination of the soil, groundwater or air by Hydrocarbons, drilling fluid or other chemicals, brine, produced water, NORM, or any other substance;
> >
> > (b)  Underground injection activities and waste disposal on the Property;
> >
> > (c)  Clean-up responses, and the cost of remediation, control, assessment or compliance with respect to surface and subsurface pollution caused by spills, pits, ponds, lagoons or subsurface storage tanks;
> >
> > (d) Non-compliance with applicable land use, surface disturbance, licensing or notification Laws or Orders;
> >
> > (e)  Disposal on the Property of any hazardous substances, wastes, materials and products generated by or used in connection with the ownership or operation of the Property before, on or after the Effective Date; and
> >
> > (f)  Non-compliance with Environmental Laws.

(docs. 74-8 at 46-47; 77-3 at 77-78.)

The PSA also provides that Paladin "shall sell, convey and assign to" Plaintiff all of its "right

and title to, and interest in, and all privileges and obligations appurtenant to . . . [a]ll Claims arising

from acts, omissions or events, or damage to or destruction of items following within this definition of the 'Property,' whether on or after the Effective Date, and all related rights, titles, claims and interests of [Paladin]." (docs. 74-8 at 19; 77-3 at 50.)  The PSA defines a "Claim," in relevant part, as "a claim as such term is defined in Section 101(5) of the Bankruptcy Code,[7] and any and all demands, losses, liabilities, damages, obligations, expenses, fines, penalties, costs, claims, causes of action and judgments for: (a) breaches of Contract; (b) loss or damage to property, injury to or death of persons (including illness and disease), and other tortious injury; or (c) violations of applicable Laws, Orders or any other legal right or duty actionable at law or equity." (doc. 74-8 at 11-12; 77-3 at 42-43.)

On June 11, 2017, a spill occurred at another Paladin well site in New Mexico (Spill B), and Paladin notified Plaintiff of Spill B on June 14, 2017. (docs. 63 at 5; 65 at 4.)  It also notified Defendant and filed a claim for coverage under the Paladin Policy for the costs associated with responding to Spill B, and the NMOCD assigned a release remediation permit for Spill B. (*Id.*) Defendant initially accepted the claim for Spill B and paid almost $25,000 for costs associated with responding to Spill B. (*Id.*)

On July 21, 2017, the bankruptcy court entered an order pursuant to "sections 105(a), 363, and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure," approving the sale of substantially all of Paladin's assets (Assets) to Plaintiff under the PSA (Sale Order). (doc. 77-3 at 138.)  The Sale Order authorized and directed Paladin to

---

[7]Under 11 U.S.C. § 101(5), a "Claim" includes both the "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured" and the "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured."

"consummate the sale of the Assets, pursuant to and in accordance with the terms and conditions of the PSA including, without limitation, the conveyance of the Assets to the High Bidder and the assumption and assignment of the Assumed Contracts to be assumed in connection with the PSA." (*Id.* at 144.)  It also provided that "the transfer and/or assignment of the Assets and the Assumed Contracts shall be effectuated on the terms set forth herein, and shall not be restricted or prohibited, notwithstanding any alleged approval rights, consent rights, preferential purchase rights, rights of purchase, rights of first refusal, rights of first offer, or similar rights with respect to the Debtor's transfer, sale vesting, assumption, and/or assignment of the Assets, including the Assumed Contracts; and any counterparties to the Assumed Contracts shall be deemed to consent to and approve of the transfer, sale, vesting, assumption, and/or assignment of the Debtor's interests in the Assets, including the Assumed Contracts, by the Debtor." (*Id.* at 148.)

The sale closed on August 18, 2017, with Plaintiff and Paladin entering an Assignment and Bill of Sale (Assignment), effective May 1, 2017, which was made and accepted subject to all of the terms and conditions of the PSA and Sale Order.  (*Id.* at 157-201.)  Under the Assignment, Paladin granted, sold, conveyed, assigned, and transferred to Plaintiff all of its right, title, and interest in and to the Property, including, among other things, "any interests related to insurance policies that may be in place to cover any liability outlined in or related to" the environmental obligations assumed by Plaintiff, "regardless of whether arising from the ownership or operation of the Property before, on or after the Effective Date," and "[a]ll Claims arising from acts, omissions or events, or damage to or destruction of" such property "whether on or after the Effective Date, and all related rights, titles, claims and interests of" Paladin. (*Id.* at 157-59, 164.)  The exhibits to the Assignment identify the assets Plaintiff acquired from Paladin, and include the interests Paladin had in the well where

13

Spill B occurred. (*Id.* at 170-81.)

On September 7, 2017, Defendant sent Paladin two letters stating that it had "settled the property damage claim filed against your St. Paul Fire And Marine policy" in connection with Spill A. (docs. 63 at 5; 65 at 4.) In October 2017, Plaintiff, Paladin, and EeTradeco, LLC (EeTradeco) entered into a Transition Agreement "to vest EeTradeco with the power and authority to assist in effectuating the orderly transitions of the rights and responsibilities relating to" Spills A and B and certain properties assigned to Plaintiff under the PSA. (doc. 77-3 at 203-09.) On June 11, 2018, NMOCD emailed Plaintiff, Defendant, and a third-party remediation contractor that the proposed remediation plan for Spill B was approved. (docs. 63 at 5; 65 at 4.) On January 19, 2018, the bankruptcy court issued an order confirming the Chapter 11 liquidation of Paladin. (doc. 77-3 at 211-15.)

## C.    **Denial of Coverage**

On or about February 28, 2019, Plaintiff and Defendant participated in a conference call with the impacted landowners, their lawyers, and the remediation contractor, regarding the approved remediation plan for Spill B. (docs. 63 at 6; 65 at 4-5.) The landowners rejected the plan and demanded a complete removal and replacement of soil at an estimated cost of $3.5 million. (*Id.*) On May 28, 2019, Defendant sent Plaintiff a letter denying coverage for Spill B under the Paladin Policy based, among other things, on the "total pollution exclusion" endorsement that altered coverage for "pollution clean-up costs." (doc. 77-3 at 26-31.)

On October 18, 2019, Plaintiff sold its interests in the well involved in Spill B, but it expressly retained all environmental liabilities concerning Spill B. (docs. 74-6 at 28; 88 at 39-41.) On or about August 18, 2020, Plaintiff submitted a formal claim to Defendant for Spill B under the

Pogo Policy. (docs. 74-6 at 35-36; 74-9 at 8.)  On September 18, 2020, Defendant sent Plaintiff a letter denying its "claim for clean-up costs with respect to Spill B" under the Pogo Policy because, among other things, the spill did not result from its "oil or gas operations as defined in the Pogo Policy," and Plaintiff failed to submit its claim within the policy's "90-day reporting period requirement for pollution claims." (doc. 74-9 at 9.)

## D.   **Procedural History**

On September 27, 2019, Plaintiff originally filed this lawsuit against Defendant in state court. (doc. 8-3.) After the case was removed to federal court, Plaintiff was granted leave to file a Second Amended Complaint on May 13, 2021. (*See* docs. 62, 63.) The Second Amended Complaint asserts claims under the Paladin and Pogo Policies for breach of contract, bad faith (including violations of Chapter 541 of the Texas Insurance Code), and declaratory relief. (doc. 63 at 13-17.) Plaintiff seeks actual and exemplary damages, prejudgment and post-judgment interest, court costs, and attorneys' fees under Tex. Civ. Prac. & Rem. Code §§ 38.001 and 37.009 and Tex. Ins. Code § 541.152. (*Id.* at 17-18.) It also requests an order declaring that Defendant "owes a duty under the Paladin and Pogo policies to 1) defend [it] against the landowner's demands related to Spill B; and 2) to indemnify [it] for the costs it has incurred and will continue to incur as a result of its legal liability to clean-up Spill B." (*Id.* at 14.)

On July 14, 2021, Defendant and Plaintiff filed competing partial motions for summary judgment. (*See* docs. 72, 75.)[8] With timely filed responses and replies (*see* docs. 84, 87, 89, 91), these motions are ripe for consideration.

---

[8]On the same day, Defendant also moved to dismiss the claims for breach of contract and bad faith under the Paladin Policy under Rule 12(c) of the Federal Rules of Civil Procedure (doc. 71), which was separately considered and denied on January 24, 2022 (doc. 95).

15

## II.  MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

The movant makes a showing that there is no genuine issue of material fact by informing the court of the basis of its motion and by identifying the portions of the record that reveal there are no genuine material fact issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If it "bears the burden of proof on an issue, either because [it] is the plaintiff or as a defendant [it] is asserting an affirmative defense, [it] must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in [its] favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original).  The moving party can also meet its summary judgment burden by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325 (internal quotation omitted).  There is "no genuine issue as to any material fact [where] a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

Once the movant makes this showing, the non-movant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Id.* at 324.  It must go beyond its pleadings and designate specific facts to show there is a genuine

issue for trial. *Id.*; *Anderson*, 477 U.S. at 249.[9]  Rule 56 imposes no obligation for a court "to sift through the record in search of evidence to support a party's opposition to summary judgment." *Adams v. Travelers Indem. Co.*, 465 F.3d 156, 164 (5th Cir. 2006) (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir.1998)).  Parties must "identify specific evidence in the record" supporting challenged claims and "articulate the precise manner in which that evidence supports [those] claim[s]." *Ragas*, 136 F.3d at 458 (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)).  While all of the evidence must be viewed in a light most favorable to the motion's opponent, *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)), neither conclusory allegations nor unsubstantiated assertions satisfy the non-movant's summary judgment burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992).  Summary judgment in favor of the movant is proper if, after adequate time for discovery, the motion's opponent fails to establish the existence of an element essential to his case and as to which he will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

### III.  BREACH OF CONTRACT

Defendant moves for summary judgment on Plaintiff's breach of contract claim under the Pogo Policy. (doc. 73 at 14-18.) Plaintiff moves for summary judgment on liability on its breach of contract claim under both the Pogo and Paladin Policies. (doc. 76 at 25-32.)

---

[9]"The parties may satisfy their respective burdens by 'citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials.'" *Rooters v. State Farm Lloyds*, 428 F. App'x 441, 445 (5th Cir. 2011) (citing Fed. R. Civ. P. 56(c)(1)).

The essential elements of a breach of contract claim in Texas[10] are: (1) the existence of a valid contract; (2) breach of the contract by the defendant; (3) performance or tendered performance by the plaintiff; and (4) damages sustained by the plaintiff as a result of the defendant's breach. *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009) (citing *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App.–Houston [14th Dist.] 2005, pet. denied)). Under Texas law, the party seeking to recover for breach of an insurance contract bears the initial "burden of establishing coverage under the terms of the policy." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010); *see also Davis v. Nat'l Lloyds Ins. Co.*, 484 S.W.3d 459, 468 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) ("[I]n the context of an insurance policy, a plaintiff must prove the existence of a valid insurance policy covering the denied claim and entitlement to money damages on that claim."). Once general coverage is established, the burden then shifts to the insurer to show that an exclusion applies and negates coverage. *JAW The Pointe, L.L.C. v. Lexington Ins.*, 460 S.W.3d 597, 603 (Tex. 2015). "If the insurer proves that an exclusion applies, the burden shifts back to the insured to show that an exception to the exclusion brings the claim back within coverage." *Gilbert*, 327 S.W.3d at 124.

"Texas law provides that insurance policies are construed according to common principles

---

[10]"It is a long-recognized principle that federal courts sitting in diversity cases 'apply state substantive law and federal procedural law.'" *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 417 (2010) (quoting *Hanna v. Plumer*, 380 U.S. 460, 465 (1965)). Here, the dispute concerns Texas insurance policies issued to Texas companies, and the alleged actions giving rise to Plaintiff's claims arose in whole or in part in Texas. (*See* docs. 63 at 1); *see De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1413 (5th Cir. 1995) (quoting *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984)) ("[T]he law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue."); *see also Faloona by Fredickson v. Hustler Magazine, Inc.*, 799 F.2d 1000, 1003 (5th Cir. 1986) (citing *Duncan*, 665 S.W.2d at 421) (contacts to take into account in determining the applicable law include the place of contracting and place of performance); *Escalon v. World Group Sec., Inc.*, No. 5:07-CV-214-C, 2008 WL 5572823, at *8 (N.D. Tex. Nov. 14, 2008) (citing *Lockheed*, 16 S.W.3d at 133-34) ("Under Texas law, the buying and selling corporations' purchase agreement's choice of law provision controls the applicability of successor liability doctrines."). The parties do not dispute that Texas law applies.

18

governing the construction of contracts, and the interpretation of an insurance policy is a question of law for a court to determine." *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel L.L.C.*, 620 F.3d 558, 562 (5th Cir. 2010); *see Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) ("Insurance policies are controlled by rules of interpretation and construction which are applicable to contracts generally."). The primary goal of the court is "to give effect to the written expression of the parties' intent." *Balandran v. Safeco Ins. Co. of America*, 972 S.W.2d 738, 741 (Tex. 1998). "Where the language of a contract is clear, a court's inquiry should begin and end with the policy's language." *Nautilus Ins. Co.*, 566 F.3d at 455. "Unless the policy dictates otherwise, [courts] give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage." *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 258 (Tex. 2017) (quoting *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015)). "When terms are defined in an insurance policy, those definitions control the interpretation of the policy." *TIG Ins. Co. v. San Antonio YMCA*, 172 S.W.3d 652, 658 (Tex. App.—San Antonio 2005, no pet.) (citing *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 823 (Tex. 1997). "Reliance on defined terms in insurance policies to construe those contracts is necessary to determine the intent of the parties and integral to the application of basic principles of contract interpretation to insurance policies." *Provident Life & Accident Ins. v. Knott*, 128 S.W.3d 211, 219 (Tex. 2003).

When construing the provisions of a policy, the court must "examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless." *Gilbert*, 327 S.W.3d at 126. "[N]o one phrase, sentence, or section of a contract should be isolated from its setting and considered apart from the other provisions." *Nassar*, 508 S.W.3d at 257. "'Endorsements

19

to a policy generally supersede and control over conflicting printed terms within the main policy;' however, the provisions found in the main 'policy and endorsement should be construed together unless' doing so would negate or render superfluous the additional coverage afforded in the endorsement." *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 115 (5th Cir. 2010) (quoting *Mesa Operating Co. v. Cal. Union Ins. Co.*, 986 S.W.2d 749, 754-55 (Tex. App.—Dallas 1999, pet. denied)). "An endorsement to an insurance policy controls the policy insofar as it enlarges, modifies, or restricts the terms of the policy, and if there is any conflict between the rider and the policy, the rider controls in construing the contract especially where the provisions of the rider are more specific." *Penthouse Owners Ass'n, Inc. v. Certain Underwriters at Lloyds, London*, 612 F.3d 383, 386 (5th Cir. 2010) (quotations and citation omitted).

"If a contract as written can be given a clear and definite legal meaning, then it is not ambiguous as a matter of law." *JAW The Pointe*, 460 S.W.3d at, 603 (citation omitted). "Any disagreement about the meaning of the contract does not render it ambiguous; instead, the contract must be 'susceptible to two or more reasonable interpretations.'" *Tesoro Ref. & Mktg. Co., L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Penn.*, 833 F.3d 470, 474 (5th Cir. 2016) (quoting *American Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003)). "[A] contract is ambiguous only when the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning." *RSUI Indem.*, 466 S.W.3d at 119. "Where an ambiguity involves an exclusionary provision of an insurance policy, [the court] 'must adopt the construction ... urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.'" *Balandran*, 972 S.W.2d at 741 (quoting *Nat'l*

*Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991); *see Mid-Continent Cas. Co. v. Swift Energy Co.*, 206 F.3d 487, 491 (5th Cir. 2000) ("In Texas, when an insurance policy is ambiguous or inconsistent, the construction that would afford coverage to the insured must govern.").

A.   **Pogo Policy**

Both parties move for summary judgment on Plaintiff's claim for breach of contract under the Pogo Policy. (docs. 73 at 14; 76 at 29.) Defendant argues that the summary judgment evidence demonstrates that because the claim was not reported within the 90-day reporting period, clean-up and remediation costs for Spill B are not covered under the Pogo Policy. (doc. 73 at 14-16.) Plaintiff argues that Spill B is covered because the uncontroverted evidence shows that Defendant became aware of Spill B within the 90-day reporting period, and any failure to comply with the notice provision does not preclude coverage because Defendant cannot demonstrate actual prejudice from the delay. (doc. 76 at 31.)

The Pogo Policy provides limited coverage for "pollution clean-up costs" from a "sudden and accidental pollution incident." (docs. 74-3 at 115-18; 77-2 at 24-27.) A "sudden and accidental pollution incident" is defined, in relevant part, as "the discharge, escape, or release of a pollutant that is sudden and accidental . . . and *is reported to us under this agreement within 90 days after it first becomes known to you* or any of your employees, your operating agent or any of its employees, your pumper-gauger or any of its employees, or any other applicable person or organization." (docs. 74-3 at 117-18; 77-2 at 26-27 (emphasis added).)

Defendant contends that there is no coverage for Spill B under the Pogo Policy because "a claim for Spill B was not tendered to [it] under the Pogo policy until well after this lawsuit was filed

21

and almost three years after the Pogo policy's 90-day reporting requirement." (doc. 73 at 15.)  It provides excerpts from the October 2020 deposition of Plaintiff's corporate representative, who acknowledged that Plaintiff did not "officially" file a claim for Spill B on the Pogo Policy before the 90-day period had ended, and that it only recently submitted a claim for coverage on the Pogo Policy because it was prudent to have a claim on the record. (doc. 74-6 at 35-37.)  It also provides the September 18, 2020 letter from Defendant to Plaintiff denying the claim for Spill B under the Pogo Policy; it explained that no coverage was provided because, among other reasons, Plaintiff failed to comply with the "90-day reporting period requirement for pollution claims." (doc. 74-9 at 8-9.)  The parties do not dispute that Spill B occurred in June 2017. (*See* docs. 63 at 5; 65 at 4.)  By pointing to evidence demonstrating that Plaintiff's claim is not covered by the "Pollution clean-up costs" provision of the Pogo Policy, Defendant has met its summary judgment burden on the breach of contract claim.

### 1.    *Prejudice*

The burden now shifts to Plaintiff to identify evidence raising a genuine issue of material fact regarding whether Spill B is covered under the Pogo Policy.  In its response to Defendant's motion, Plaintiff argues that Defendant must show prejudice to deny coverage for its "belated claim" because the Pogo Policy is an "occurrence policy." (doc. 87 at 29.)  It provides the printout of Defendant's website that describes the same policy issued to Plaintiff as providing "occurrence-based coverage, including for pollution claims or suits." (doc. 63-9 at 2.)

In Texas, "courts traditionally distinguish between two types of insurance policies: 'occurrence' policies and 'claims-made' policies." *Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co.*, 174 F.3d 653, 658 (5th Cir. 1999). Occurrence policies cover the insured for acts or

22

omissions that happened during the policy period, regardless of whether "the claim ... is brought to the attention of the insured or made known to the insurer during the policy period," while claims-made policies cover the insured for all claims reported to the insurer during the policy period, "regardless of when the covered act or omission occurred." *Id.* at n.2 (citations omitted); *see also Prodigy Commc'ns Corp. v. Agric. Excess & Surplus Ins. Co.*, 288 S.W.3d 374, 378-79 (Tex. 2009) ("[T]he main difference between ['claims-made' and 'occurrence'] policies is that a 'claims-made' policy provides unlimited retroactive coverage and no prospective coverage, while an 'occurrence' policy provides unlimited prospective coverage and no retroactive coverage."). "Notice provisions, which are generally contained in both claims-made and occurrence policies, are provisions in insurance contracts that, in a claims-made policy, require the insured to give the insurer prompt notice of a potential claim against the insured and in an occurrence policy, require the insured to give prompt notice of an event that the insured seeks recovery for." *Int'l Ins. Co. v. RSR Corp.*, 148 F. App'x 226, 231 (5th Cir. 2005). In an occurrence policy, coverage is based on the triggering event, and any notice requirement "is subsidiary to the event that triggers coverage." *Matador*, 174 F.3d at 958. Under a claims-made policy, "notice itself constitutes the event that triggers coverage." *Id.* at 959. Because courts strictly enforce notice requirements in claims-made policies, the insurer does not need to show prejudice to deny coverage on the basis of untimely notice under a claims-made policy. *Id.*

While a showing of prejudice by the insurer is generally required where the insured fails to comply with an occurrence policy's notice provisions, an insurance policy can "share characteristics in common with both an 'occurrence' and a 'claims-made' policy." *See Matador*, 174 F.3d at 659. To determine whether the insurer must demonstrate prejudice to deny coverage for the insured's

23

untimely notice of a claim, the court must examine the policy's provisions and ascertain whether the nature of the bargain underlying the agreement between the parties resembles an occurrence or claims-made policy. *See id.*; *see also Starr Indem. & Liab. Co. v. SGS Petroleum Serv. Corp.*, No. CV-H-11-2461, 2012 WL 12877817, at *6 (S.D. Tex. July 24, 2012), *aff'd by* 719 F.3d 700 (5th Cir. 2013) ("The nature of the bargain in an 'occurrence' policy does not require strict compliance with notice requirements, but the nature of the bargain in a 'claims-made' policy differs, and may require strict compliance.").

Under the plain language of the "Pollution clean-up costs" provision, a sudden and accidental pollution incident must be reported to Defendant "under this agreement" within a 90-day reporting period for pollution clean-up costs coverage to apply. (docs. 74-3 at 118; 77-2 at 27.)  In *Matador*, the Fifth Circuit found that an oil and gas commercial general liability policy with a similar notice requirement shared characteristics in common with both occurrence and claims-based policies, but resembled the nature of the bargain underlying a claims-made policy. *See* 174 F.3d at 659. The policy provided coverage for pollution incidents and stated that "a pollution incident is covered only if the incident is known to you or your operating partner within 7 days of its beginning and is reported to the company within 30 days of its beginning." *Id.* at 657 (cleaned up). The Fifth Circuit found that this language plainly showed that "timely reporting of the claim constituted one of the events necessary to trigger coverage." *Id.* at 660. Because the provision was similar in nature to a claims-made policy, strict compliance with the 30-day notice provision was required, and "whether the insurer suffered prejudice as a result of the late notice was irrelevant." *Id.*

Like the notice provision in *Matador*, the plain language of the "Pollution clean-up costs" provision in the Pogo Policy unambiguously provides that the timely reporting of the incident "under

24

this agreement" constitutes one of the events necessary to trigger coverage. *See Matador,* 174 F.3d at 660. Whether the pollution incident is reported within the required 90-day period is not "a general notice requirement but rather is an integral part of the definition of the risk covered." *St. Paul Surplus Lines Ins. Co. v. Davis Gulf Coast, Inc.*, No. CIV.A. H-11-0403, 2012 WL 2160445, at *6 (S.D. Tex. June 13, 2012) (analyzing an almost identical pollution clean-up coverage provision with the same 90-day reporting period under Texas and Oklahoma law, and concluding that insurer did not need to show prejudice to deny coverage for the insured's noncompliance). Accordingly, Defendant need not show prejudice resulting from Plaintiff's failure to comply with the Pogo Policy's 90-day notice requirement. *See Starr*, 2012 WL 12877817, at *9 (finding notice requirement in an occurrence policy that resembled the notice provision of a "claims-made" policy requires strict compliance without a showing of prejudice); *see also Blanco W. Properties, LLC v. Arch Specialty Ins. Co.*, No. CV H-18-0897, 2018 WL 6573117, at *6 (S.D. Tex. Oct. 5, 2018), *aff'd sub nom. by* 773 F. App'x 795 (5th Cir. 2019) (granting summary judgment in favor of insurer on insured's breach of contract claim after refusing to impose "a requirement that the insurer demonstrate prejudice from the insured's failure to comply with a specific endorsement provision for notice to the insurer within an explicitly defined time period").

### 2.    *Estoppel*

Plaintiff argues that Defendant is estopped under the doctrines of promissory and quasi-estoppel from denying coverage based on the 90-day notice requirement because it promised to provide coverage for Spill B under the Paladin Policy for two years. (doc. 87 at 27.)

"Promissory estoppel generally is a defensive doctrine in that it estops a promisor from denying the enforceability of [a] promise." *Trammell Crow Co. No. 60 v. Harkinson*, 944 S.W.2d

631, 636 (Tex. 1997). Similarly, "[q]uasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000). It is well established in Texas, however, that "[t]he doctrine of estoppel cannot be used to create insurance coverage when none exists by the terms of the policy." *Tex. Farmers Ins. Co. v. McGuire*, 744 S.W.2d 601, 602-03 (Tex. 1988) (citing *Washington Nat. Ins. Co. v. Craddock*, 130 Tex. 251, 109 S.W.2d 165 (Tex. 1937)); *Minnesota Mut. Life Ins. Co. v. Morse*, 487 S.W.2d 317, 320 (Tex. 1972) ("[W]aiver and estoppel cannot enlarge the risks covered by a policy and cannot be used to create a new and different contract with respect to the risk covered and the insurance extended."). "Changing a policy's coverage to encompass risks otherwise not covered must be by contractual means." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 787 (Tex. 2008).

As explained, the 90-day notice requirement is part of the definition of an incident covered by the "Pollution clean-up costs" provision. (*See* docs. 74-3 at 117-18; 77-2 at 26-27.) Because the insured's compliance with this requirement triggers coverage under the Pogo Policy, allowing Plaintiff to disregard it "would substantially alter and enlarge the risks covered under the insurance policy." *Matador*, 174 F.3d at 661; *see also Komatsu v. United States Fire Ins. Co.*, 806 S.W.2d 603, 607 (Tex.App.–Fort Worth 1991, writ denied) ("Extension of the notice period in a claims-made policy constitutes an unbargained for expansion of coverage."). Accordingly, Defendant is not estopped from denying coverage on this basis.

### 3.    *Other Coverage*

Plaintiff argues that the 90-day notice requirement "only applies to the coverage in the Pogo Policies for 'Pollution clean-up costs,'" and "does not apply to any of the other coverage separately

provided by the Pogo Policies, including coverage for (1) property damage liability and (2) the right and duty to defend against claims or suits for injury or damage or pollution clean-up costs." (doc. 87 at 31.) The Second Amended Complaint does not allege that Plaintiff submitted claims under the Pogo Policy for property damage or for defending it in an underlying lawsuit that were denied by Defendant, however. *See United Neurology, P.A. v. Hartford Lloyd's Ins. Co.*, 101 F. Supp. 3d 584, 617 (S.D. Tex.), *aff'd by* 624 F. App'x 225 (5th Cir. 2015) ("An insured bears the burden of showing that it made a claim under the insurance policy."). Although it quotes the "Bodily injury and property damage liability" provision, there are no allegations of damages that Plaintiff is legally required to pay for property damages arising from Spill B, and it concedes that no lawsuit has been filed by any party against it in connection with Spill B. (*See* doc. 87 at 31.) Plaintiff fails to identify a genuine issue of material fact as to whether Defendant breached the Pogo Policy by denying coverage for property damage or defending it a lawsuit.

### 4.    *Duty to Search*

Plaintiff contends that Defendant breached the Pogo Policy when it did not search for coverage for Spill B under that policy after denying coverage under the Paladin Policy. (doc. 87 at 32.) It argues that Defendant owed it the duty to search for coverage because it was the assignee of the Paladin Policy and was also the named insured of the Pogo Policy. (*Id.*) Plaintiff does not identify a provision in the Pogo Policy that requires Defendant to search for coverage when denying a claim for coverage, or cite any legal authority to support the argument that an insurer has a contractual duty to search for coverage under other insurance policies that the insured may have with the insurer, however. *See generally Nat'l Union Fire Ins. Co. v. Crocker*, 246 S.W.3d 603, 608 (Tex. 2008) ("Mere awareness of a claim or suit does not impose a duty on the insurer to defend under the

policy; there is no unilateral duty to act unless and until the additional insured first requests a defense.").

In conclusion, the undisputed evidence shows that Plaintiff reported Spill B under the Pogo Policy to Defendant more than three years after the spill. As discussed, the "Pollution clean-up costs" provision provides clearly and unambiguously that compliance with the 90-day notice requirement is a condition of coverage. Because strict compliance with this notice provision is required, and it is undisputed that Plaintiff failed to comply with this requirement, the summary judgment evidence would not permit a reasonable trier of fact to find that Defendant breached the Pogo Policy by denying coverage for pollution clean-up costs. Because it has met its summary judgment burden to show a failure of proof regarding the breach of the Pogo Policy, its motion on this claim is granted. Plaintiff has failed to meet its burden, and its motion for summary judgment on this claim is denied.

**B.    Paladin Policy**

Plaintiff moves for summary judgment on the liability portion of its breach of contract claim under the Paladin Policy. (doc. 76 at 25.)  It argues that it has privity of contract under the policy, the costs for clean up and remediation in connection with Spill B are covered by it, and Defendant breached the policy when it denied coverage. (*Id.* at 25-29.)

*1.    Privity*

"[U]nder Texas law privity of contract is an essential element necessary to any recovery in an action based on contract." *Interstate Contracting Corp. v. City of Dallas, Tex.*, 320 F.3d 539, 543 (5th Cir. 2003).  Because "maintenance of an action for breach of contract generally requires privity between the party damaged and the party sought to be held liable ... [t]he plaintiff has the burden

of proving that the defendant has obligated himself under the contract." *C & C Partners v. Sun Exploration & Production Co.*, 783 S.W.2d 707, 721-22 (Tex.App.–Dallas 1989, writ denied), *overruled in part by Formosa Plastics Corp. USA v. Presidio Eng'rs & Contrs.*, 960 S.W.2d 41, 46 (Tex. 1998). "Privity is established by proof that the defendant was a party to an enforceable contract with either the plaintiff or a party who assigned its cause of action to the plaintiff." *Brown v. Mesa Distributors, Inc.*, 414 S.W.3d 279, 284-85 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

An assignment is a contract between the assignor of a right and an assignee and is subject to the same rules of construction as ordinary contracts. *See Pagosa Oil & Gas, L.L.C. v. Marrs & Smith P'ship*, 323 S.W.3d 203, 211 (Tex.App.–El Paso 2010, pet. denied); *D Design Holdings, L.P. v. MMP Corp.*, 339 S.W.3d 195, 201 (Tex. App.—Dallas 2011, no pet.). "When an assignee holds a contractually valid assignment, that assignee steps into the shoes of the assignor and may assert those rights that the assignor could assert." *1 Lincoln Fin. Co. v. Am. Family Life Assur. Co. of Columbus*, 02-12-00516-CV, 2014 WL 4938001, at *4 (Tex. App.—Fort Worth Oct. 2, 2014, no pet.) (citing *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 420 (Tex. 2000)). This is because "an assignment carries with it all rights, remedies, and benefits that are incidental to the thing assigned, and the effect of an assignment can only be limited by exceptions, reservations, conditions, or restrictions contained therein." *Twelve Oaks Tower I, Ltd. v. Premier Allergy, Inc.*, 938 S.W.2d 102, 114 (Tex. App.–Houston [14th Dist.] 1996, no writ); *see also F.D.I.C. v. McFarland*, 243 F.3d 876, 887 n.42 (5th Cir. 2001) ("[A]n assignee takes all of the rights of the assignor, no greater and no less.") (citation omitted). "As a general rule, all contracts are assignable." *Crim Truck & Tractor Co. v. Navistar Intern. Transp. Corp.*, 823 S.W.2d 591, 596 (Tex. 1992).

To meet its summary judgment burden, Plaintiff points to the PSA, Assignment, and Sale

Order as evidence that Paladin's interests in the Paladin Policy were assigned to it. (doc. 76 at 26.) The PSA, which was effective May 1, 2017, set forth the terms and conditions of the sale and assignment of substantially all of Paladin's assets to Plaintiff and was conditioned upon approval by the bankruptcy court.  (docs. 74-8 at 10; 77-3 at 41.)  The Sale Order authorized and directed Paladin to "consummate the sale of the Assets, pursuant to and in accordance with the terms and conditions of the PSA including, without limitation, the conveyance of the Assets to the High Bidder and the assumption and assignment of the Assumed Contracts to be assumed in connection with the PSA." (doc. 77-3 at 144.)  The Assignment, also effective May 1, 2017, granted, sold, conveyed, assigned, and transferred to Plaintiff all of Paladin's right, title, and interest in and to the Property, including, among other things, "any interests related to insurance policies that may be in place to cover any liability outlined in or related to" the environmental obligations assumed by Plaintiff, "regardless of whether arising from the ownership or operation of the Property before, on or after the Effective Date," and "[a]ll Claims arising from acts, omissions or events, or damage to or destruction of" such property "whether on or after the Effective Date, and all related rights, titles, claims and interests of" Paladin.  (*Id.* at 157-59, 164.)  The undisputed evidence shows that Paladin's interests in the well where Spill B occurred on June 11, 2017, were assigned to Plaintiff under the Assignment. (*Id.* at 170-81; *see* docs. 63 at 5; 65 at 4.)

This evidence is sufficient to establish Plaintiff's contractual privity under the Paladin Policy. Spill B meets the plain and ordinary meaning of an occurrence or event on or relating to Paladin's property that arose from the ownership or operation of that property "before, on or after the Effective Date, of May 1, 2017," which was an environmental obligation assumed by Plaintiff under the terms of the PSA and Assignment. (*See* docs. 74-8 at 18-19, 46-47; 77-3 at 49-50, 77-78,

157-59, 164.)  The PSA, Assignment, and Sale Order establish that any interests Paladin had in insurance policies that covered any liability relating to Spill B, including the Paladin Policy, were assigned to Plaintiff. (*See id.*; doc. 77-3 at 138, 144, 148.)  Plaintiff has met its summary judgment burden. *See S. County Mut. Ins. v. Sur. Bank N.A.*, 187 S.W.3d 178, 181-82 (Tex. App.–Fort Worth 2006, no pet.) (concluding that assignee of assignor's right to receive amounts payable under the insurance policy stood in the shoes of assignor and could "assert only those rights under the insurance policy that [assignor] itself could assert"); *see also Old Am. Ins. Co. v. Lincoln Factoring, LLC*, 571 S.W.3d 271, 282 n.19 (Tex. App.—Fort Worth 2018, no pet.) ("An assignee of insurance benefits may sue an insurer for breach of contract.") (citation omitted).

The burden now shifts to Defendant to identify evidence in the record raising a genuine issue of material fact that Plaintiff does not have standing to sue on the Paladin Policy. *See Celotex Corp.*, 477 U.S. at 324.  Defendant argues that the Paladin Policy contains an anti-assignment clause "that voids any attempt to transfer rights under the policy without [its] consent." (doc. 84 at 11.)  The anti-assignment clause provides, in part:

> **Assignments and Transfers**
> Neither you nor any other person or organization protected under your policy can assign, transfer, or otherwise turn over, your interest in it without consent from us in a written form that's made part of your policy.

(docs. 74-1 at 13; 77 at 19.)

Anti-assignment clauses in insurance contracts are generally enforced by Texas courts.  *See Nautilus Ins. Co. v. Concierge Care Nursing Centers, Inc.*, 804 F. Supp. 2d 557, 559 (S.D. Tex. 2011); *see also Conoco, Inc. v. Republic Ins. Co.*, 819 F.2d 120, 124 (5th Cir. 1987) ("Texas law permits the enforcement of no-assignment clauses in insurance policies.").  "These clauses are enforceable unless rendered ineffective by an applicable statute, estoppel, waiver, or some other

31

aspect of contract law." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Puget Plastics Corp.*, 649 F. Supp.2d 613, 623 (S.D. Tex. 2009), *aff'd by* 454 F. App'x 291 (5th Cir. 2011) (citing *Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 721 (Tex.App.–Dallas 2004, no pet.)).

Section 365(f)(1) of the Bankruptcy Code states, in relevant part, that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection." 11 U.S.C. § 365(f)(1). This statute permits a bankruptcy trustee to assume an executory contract and assign the contract "even where legal or contractual provisions would otherwise prohibit assignment." *Matter of Provider Meds, L.L.C.*, 907 F.3d 845, 851 (5th Cir. 2018). While the term "executory contract" is not defined in the Bankruptcy Code, the Fifth Circuit has concluded that "an agreement is executory if at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party." *Matter of Murexco Petroleum, Inc.*, 15 F.3d 60, 62-63 (5th Cir. 1994) (citations omitted). "For purposes of the Bankruptcy Code, an insurance policy is a contract." *Charter Sch. Sols. v. GuideOne Mut. Ins. Co.*, 407 F. Supp. 3d 641, 647 (W.D. Tex. 2019) (citations omitted).

The summary judgment evidence shows that the bankruptcy court approved the sale and assignment of Paladin's assets to Plaintiff, including the interests in the Paladin Policy, under, among other statutes, § 365 of the Bankruptcy Code. (*See* doc. 77-3 at 137-55.)  Specifically, the Sale Order provided that "the transfer and/or assignment of the Assets and the Assumed Contracts shall be effectuated on the terms set forth herein, and *shall not be restricted or prohibited, notwithstanding any alleged approval rights, consent rights, preferential purchase rights, rights of*

32

*purchase, rights of first refusal, rights of first offer, or similar rights with respect to the Debtor's transfer, sale vesting, assumption, and/or assignment of the Assets*, including the Assumed Contracts; and any counterparties to the Assumed Contracts shall be deemed to consent to and approve of the transfer, sale, vesting, assumption, and/or assignment of the Debtor's interests in the Assets, including the Assumed Contracts, by the Debtor." (*Id.* at 148 (emphasis added).)  Because any restriction or prohibition on the assignment of the Assets, including the Paladin Policy, was expressly invalidated under the Sale Order and under § 365 of the Bankruptcy Code, the anti-assignment provision in the Paladin Policy has been "rendered ineffective." *See Puget Plastics*, 649 F. Supp.2d at 623; *see, e.g., Charter Sch. Sols.*, 407 F. Supp.3d at 649 (finding trustee was authorized under § 365(f)(1) to transfer insurance policy with a non-assignment clause during insured's bankruptcy proceedings); *see also Safeco Ins. Co. of Am. v. Clear Vision Windshield Repair, LLC*, 564 S.W.3d 913, 919 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("Anti-assignment clauses are enforceable unless rendered ineffective by a statute or through the application of contract law.").  Plaintiff has met its summary judgment burden establishing privity of contract under the Paladin Policy.

### 2.  *Coverage*

As discussed, "[t]o ultimately recover for breach of contract, [Plaintiff]—as the insured—has the initial burden of pleading and proving that the [Paladin Policy] provided coverage." *Finger Oil & Gas, Inc. v. Mid-Continent Cas. Co.*, No. 5-20-CV-00712-RBF, 2021 WL 4895727, at *5 (W.D. Tex. Oct. 20, 2021) (citing *JAW The Pointe*, 460 S.W.3d at 603); *see Gilbert*, 327 S.W.3d at 124 ("Initially, the insured has the burden of establishing coverage under the terms of the policy.").

Plaintiff points to the Paladin Policy, and contends that its claim for Spill B is covered under

33

the plain text of the "Pollution clean-up costs" provision, as modified by the DW Endorsement, because the spill resulted in "pollution clean-up costs that [were] incurred for a sudden and accidental pollution incident" that occurred "while this agreement [was] in place" and resulted from "your work or your completed work in the performance of your oil or gas operation," including "your above-ground operations for disposal wells" and was not the result of "any intentional and willful violation of any governmental law, regulation, or rule." (docs. 76 at 26-27 n.13; 77 at 8-149.) Neither party disputes that Spill B occurred during above-ground operations at Paladin's saltwater well when the Paladin Policy was in effect. (*See* docs. 63 at 5; 65 at 4.)  It is undisputed that Paladin timely reported Spill B to Defendant under the Paladin Policy, and that costs for clean up and remediation have and will be incurred for Spill B. (*Id.*)  Plaintiff has satisfied its initial burden of showing that the claim for pollution clean-up costs for Spill B falls within the Paladin Policy's scope of coverage.

The burden shifts to Defendant to prove that an exclusion applies and negates coverage. *See Finger Oil & Gas,* 2021 WL 4895727, at *5 (citing *JAW The Pointe*, 460 S.W.3d at 603) ("Once general coverage is established, the burden then shifts to [the insurer] to prove that an exclusion applies and negates coverage.").  Defendant argues that the Paladin Policy contains the TPE Endorsement, which modifies the exclusions of the CGL policy, and expressly excludes pollution clean-up costs coverage for Spill B. (doc. 84 at 16-17.)  The TPE Endorsement expressly states that it includes changes to the CGL policy that "exclude coverage." (*See* docs. 74-1 at 137; 77 at 143.) This endorsement narrows the scope of coverage under the CGL policy by removing the exceptions to the definition of "waste," which in turn limits the types of substances that are covered as part of "your oil and gas operations." (*See* docs. 74-1 at 86-87; 77 at 92-93.)  It also expands the scope of

exclusions under the CGL policy by removing the exceptions contained in the "Pollution clean-up costs," "Pollution injury or damage," and "Pollution work loss, cost, or expense" exclusions, which eliminates pollution coverage under the CGL policy. (*See* docs. 74-1 at 110-13; 77 at 116-19.) When the provisions of the CGL policy are construed together with the TPE Endorsement, the exclusions remove coverage for pollution clean-up costs for incidents like Spill B.

As explained, courts must read *all parts* of the policy together, and give "effect to each word, clause, and sentence, and avoid making any provision within the policy inoperative." *State Farm Lloyds v. Page*, 315 S.W.3d 525, 527 (Tex. 2010). Each endorsement states that "All other terms of your policy remain the same." (docs. 74-1 at 127, 137; 77 at 133, 143.) The plain language in the DW Endorsement broadens coverage for above-ground operations for disposal wells under the "Bodily injury and property damage liability" and "Pollution clean-up costs" provisions of the CGL policy form by adding "your above-ground operations for disposal wells" to the definition of "your oil or gas operations" in the form's coverage section, and by adding "your above ground operations for disposal wells" to the exceptions under the form's "Pollution injury or damage" exclusion. (*See* docs. 74-1 at 86-87, 110-13, 127; 77 at 92-93, 116-19, 133.) The TPE Endorsement removes most of the exceptions to the "Pollution injury or damage" exclusion of the CGL policy, including the exception for a "sudden and accidental pollution incident." (*See* docs. 74-1 1at 10-12, 137; 77 at 116-18, 143.) Moreover, each endorsement replaces the definition of the same defined term in the CGL policy: the DW Endorsement modifies the definition of "waste" under the coverage section by adding another exception for waste, while the TPE Endorsement modifies the same term by eliminating all exceptions for waste. (*See* docs. 74-1 at 110-13, 137; 77 at 116-19, 143.)

If the TPE Endorsement controls, it would eliminate the additional coverage provided by the

DW Endorsement for above-ground operations for disposal wells, including the added coverage for pollution clean-up costs for such operations, which would render the DW Endorsement meaningless. *See Big Binder Express, L.L.C. v. Liberty Mut. Fire Ins. Co.*, 843 F. App'x 548, 553 (5th Cir. 2021) (rejecting interpretation of policy that would render an endorsement meaningless because it would be "unreasonable for an insured that agreed to an endorsement to think that the endorsement has no effect").   Because the exclusions modified by the TPE Endorsement are inconsistent with the modified terms broadening coverage under the DW Endorsement, the interaction among these endorsements makes the Paladin Policy ambiguous as a matter of law. When, as here, an endorsement eliminating coverage creates ambiguity by conflicting with an endorsement expanding coverage, the reasonable construction that affords coverage to the insured governs. *See Bay Rock Operating*, 614 F.3d at 115 (concluding that because the application of the exclusion would eliminate the additional coverage provided by the endorsement, the exclusion was superseded); *see also Valmont Energy Steel, Inc. v. Commercial Union Ins. Co.*, 359 F.3d 770, 774 (5th Cir. 2004) ("If the court finds an ambiguity in the contract provisions, particularly in an exclusion clause, the court should construe the policy strictly against the insurer."); *Terry Black's Barbecue, L.L.C. v. State Auto. Mut. Ins. Co.*, No. 21-50078, 2022 WL 43170, at *3 (5th Cir. Jan. 5, 2022) ("When an insurance policy is ambiguous, and the parties offer conflicting reasonable interpretations of the policy, Texas law favors adopting the interpretation in favor of the insured."). Because the reasonable interpretation of the insurance policy that favors coverage governs, "the conflicting exclusions must be ignored in order to give meaning to the coverage provided by" the DW Endorsement. *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, No. SA-07-CA-274-OG, 2009 WL 5341825, at *7 (W.D. Tex. Sept. 30, 2009), *aff'd by* 614 F.3d 105 (5th Cir. 2010); *see INA of*

*Tex. v. Leonard*, 714 S.W.2d 414, 417 (Tex. App.—San Antonio 1986, writ ref'd n.r.e.) (resolving ambiguity between conflicting endorsements in favor of insured, where one endorsement excluded coverage and a subsequent endorsement provided coverage); *see, e.g., Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 559 (5th Cir. 2004) (finding Saline Endorsement to CGL policy that increased the amount payable to insureds on a coverage claim provided coverage, as insurer's arguments for limiting coverage under a Pollution Exclusion and Pollution Endorsement "would render the entire Saline Endorsement meaningless because essentially everything covered by the endorsement would necessarily be excluded by the Pollution Exclusion clause"). Defendant has failed to meet its burden of showing that exclusions apply. Accordingly, Plaintiff is entitled to summary judgment on its claim that remediation and clean-up costs for Spill B are covered under the "Pollution clean-up costs" provision, as modified by the DW Endorsement of the Paladin Policy.

### 3.     *Contractual Breach*

To recover for a breach of insurance contract, the plaintiff must show that the insurer actually breached that contract. *See Price v. Dearborn Nat'l Life Ins. Co.*, No. SA-15-CV-369-XR, 2016 WL 5794800, at *3 (W.D. Tex. Oct. 3, 2016) (citing *U.S. Fire Ins. Co. v. Lynd Co.*, 399 S.W.3d 206, 215 (Tex. App.—San Antonio 2012, pet. denied)). "A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform." *Case Corp. v. Hi-Class Bus. Sys.*, 184 S.W.3d 760, 669-70 (Tex. App.—Dallas 2005, pet. denied). "Whether a party has breached a contract is a question of law." *Gardocki v. J.P. Morgan Chase Bank*, No. 12-2254, 2014 WL 12537076, at *4 (S.D. Tex. June 11, 2014) (citing cases).

Plaintiff provides the May 28, 2019 letter from Defendant denying the claim for pollution clean-up costs coverage for Spill B under the Paladin Policy. (*See* doc. 77-3 at 26-31.) As explained,

Plaintiff has established that this claim is covered under the "Pollution clean-up costs" provision, as modified by the DW Endorsement, of the Paladin Policy. Plaintiff's evidence is sufficient to establish that Defendant breached the Paladin Policy when it denied coverage for Spill B.

The burden shifts to Defendant to produce evidence to support that there is a disputed material fact. Defendant does not dispute that it denied coverage for Spill B under the Paladin Policy, and it does not point to any evidence creating a genuine dispute of material fact that the denial of coverage was a breach of the Paladin Policy. Plaintiff is entitled to summary judgment as a matter of law on this claim, and its motion for summary judgment on the liability portion of its breach of contract claim under the Paladin Policy is granted.

## IV. DECLARATORY JUDGMENT

Defendant moves for summary judgment as to Plaintiff's request for declaratory relief under the Pogo Policy. (doc. 73 at 21.) Plaintiff moves for summary judgment on its request for declaratory relief under both policies. (doc. 76 at 32.)

The federal Declaratory Judgment Act (Act) provides that "[i]n a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. The Act "does not create a substantive cause of action" and "is merely a vehicle that allows a party to obtain an early adjudication of an actual controversy arising under other substantive law." *Metropcs Wireless, Inc. v. Virgin Mobile USA, L.P.*, 3:08-CV-165-D, 2009 WL 3075205, at *19 (N.D. Tex. Sept. 25, 2009) (citations and quotations omitted). The Act is an authorization and not a command and allows federal courts broad, but not unfettered, discretion to grant or refuse declaratory judgment. *Id.*

38

Nevertheless, "[i]f a request for a declaratory judgment adds nothing to an existing lawsuit, it need not be permitted." *Cypress/Spanish Ft. I, LP v. Prof'l Serv. Indus., Inc.*, 814 F. Supp. 2d 698, 710 (N.D. Tex. 2011) (citing *Madry v. Fina Oil & Chem. Co.*, 44 F.3d 1004, 1994 WL 733494, at *2 (5th Cir. 1994)).

A.    **Pogo Policy**

Both parties move for summary judgment on Plaintiff's declaratory relief claim under the Pogo Policy based on the same arguments raised in their motions regarding the breach of contract claim. (docs. 73 at 21; 76 at 32.) Plaintiff seeks declaratory judgment that Defendant owes a duty under the Pogo Policy to indemnify and defend it in connection with Spill B. (doc. 63 at 14.) This declaratory relief claim fails for the same reason the breach of contract claim fails—the policy does not cover the Spill B claim because it was not reported within the 90-day reporting period. For the same reasons discussed above, Defendant's motion for summary judgment on the declaratory judgment claim under the Pogo Policy is granted, and Plaintiff's motion for summary judgment on this claim is denied.

B.    **Paladin Policy**

Plaintiff moves for summary judgment on its declaratory relief claim under the Paladin Policy  for the same reasons set forth in its motion regarding the breach of contract claim. (doc. 76 at 32.)

1.    *Duty to Indemnify*

Plaintiff seeks summary judgment on its request for a declaratory judgment that Defendant owes a duty under the Paladin Policy "to indemnify [it] for the costs it has incurred and will continue to incur as a result of its legal liability to clean-up Spill B." (doc. 76 at 32.)

39

As discussed, the summary judgment evidence establishes that the Paladin Policy provides Plaintiff coverage for pollution clean-up costs for Spill B, and that it is entitled to summary judgment on its breach of contract claim under the Paladin Policy. "Courts in the Fifth Circuit regularly reject declaratory judgment claims seeking the resolution of issues that will be resolved as part of the claims in the lawsuit." *Am. Equip. Co. v. Turner Bros. Crane & Rigging, LLC*, No. 4:13-CV-2011, 2014 WL 3543720, at *4 (S.D. Tex. July 14, 2014) (citing cases). Because Plaintiff's declaratory relief claim for indemnification under the Paladin Policy mirrors its breach of contract claim and adds nothing in its action against Defendant, it is duplicative and is "unavailable as a matter of law." *See Vandelay Hosp. Grp. LP v. Cincinnati Ins. Co.*, No. 3:20-CV-1348-D, 2020 WL 4784717, at *7 (N.D. Tex. Aug. 18, 2020) (citation omitted); *Madry*, 1994 WL 733494, at *2 (reversing award of declaratory relief where "[t]he declaratory judgment does not declare any significant rights not already at issue in the contract dispute"); *Xtria LLC v. Tracking Sys., Inc.*, No. 3:07-CV-0160-D, 2007 WL 1791252, at *3 (N.D. Tex. June 21, 2007) (dismissing the plaintiff's declaratory judgment action because it "essentially duplicates [the plaintiff's] breach of contract claim"); *Scritchfield v. Mutual of Omaha Ins. Co.*, 341 F. Supp.2d 675, 682 (E.D. Tex. 2004) (dismissing plaintiffs' declaratory judgment claims because "[p]laintiffs would get nothing from a declaratory judgement [sic] that they would not get from prevailing on their breach of contract claims").

### 2.    *Duty to Defend*

Plaintiff contends that it is entitled to summary judgment on its request for declaratory judgment that Defendant owes a duty under the Paladin Policy "to defend [it] against the landowner's demands related to Spill B." (doc. 76 at 32.)

In Texas, "[t]he duty to defend means the insurer will defend the insured in any lawsuit that 'alleges and seeks damages for an event potentially covered by the policy.'" *Colony Ins. Co. v. Peachtree Const., Ltd.*, 647 F.3d 248, 252-53 (5th Cir. 2011) (quoting *D.R. Horton–Texas, Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 743 (Tex. 2009)). "Under the eight-corners rule, the duty to defend is determined by the claims alleged in the petition and the coverage provided in the policy." *Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co.*, 279 S.W.3d 650, 654 (Tex. 2009). "If a petition does not allege facts within the scope of coverage, an insurer is not legally required to defend a suit against its insured." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997).

Here, Plaintiff does not identify or cite to the provision in the Paladin Policy upon which it relies in support of its claim that Defendant owed it a "duty to defend" in a lawsuit against it by the landowners impacted by Spill B.  (*See* doc. 76 at 32-33.)  It has therefore not met its summary judgment burden on this issue.[11]

Because Plaintiff has not met its summary judgment burden on its declaratory judgment claim under the Paladin Policy, its summary judgment motion is denied as to this claim.

## V.  BAD FAITH

Defendant moves for summary judgment on Plaintiff's bad faith claim under the Pogo Policy, arguing it fails as a matter of law. (doc. 73 at 18.)

To succeed on a breach of the duty of good faith and fair dealing claim, the insured must

---

[11]In its response to Defendant's motion for summary judgment on the breach of contract claim under the Pogo Policy, Plaintiff generally cites the Pogo Policy and contends that it includes coverage for "the right and duty to defend against claims or suits for injury or damage or pollution clean-up costs." (doc. 87 at 31.) Even assuming that Defendant owed the same "duty to defend" under the Paladin Policy, Plaintiff does not cite the specific provision in either policy giving rise to that duty.

prove that (1) "the insurer had no reasonable basis for the denial or delay in payment of a claim" and (2) "the insurer knew or should have known of that fact." *Laws. Title Ins. Corp. v. Doubletree Partners, L.P.*, 739 F.3d 848, 869 (5th Cir. 2014) (quoting *Union Bankers Ins. Co. v. Shelton*, 889 S.W.2d 278, 283 (Tex. 1994)). "Liability under § 541 of the Texas Insurance Code is analyzed under the same standard as common-law bad faith claims." *Rapid Tox Screen LLC v. Cigna Healthcare of Texas Inc.*, No. 3:15-CV-3632-B, 2017 WL 3658841, at *14 (N.D. Tex. Aug. 24, 2017) (citing *Hamilton Props. v. Am. Ins. Co.*, 643 F. App'x 437, 442 (5th Cir. 2016)). "As a general rule there can be no claim for bad faith when an insurer has promptly denied a claim that is in fact not covered." *JAW The Pointe*, 460 S.W.3d at 602.  If the insurer has properly denied coverage, a claim for bad faith only exists if the insurer committed an act "so extreme" to "cause injury independent of the policy claim." *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995). Similarly, "an insured cannot recover any damages based on an insurer's statutory violation if the insured had no right to receive benefits under the policy and sustained no injury independent of a right to benefits." *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 500 (Tex. 2018).

Defendant argues that it properly denied coverage under the Pogo Policy, and that there is no evidence of extreme conduct causing Plaintiff injury independent of its policy claim. (doc. 73 at 20-21.) By pointing out the need for, and lack of, evidence of independent injury from extreme conduct, it has met its summary judgment burden. *See Celotex*, 477 U.S. at 325.

The burden now shifts to Plaintiff to identify a genuine issue of material fact regarding whether Defendant had engaged in extreme acts that caused it independent injury. Plaintiff contends that it was "extremely egregious" for Defendant to deny coverage under the Paladin Policy two years after accepting coverage and to subsequently deny coverage under the Pogo Policy based on the 90-

42

day notice requirement. (doc. 87 at 38.) As explained, Plaintiff is not entitled to pollution clean-up costs coverage under the Pogo Policy for Spill B. Even though Spill B occurred in 2017, the summary judgment evidence shows that Plaintiff did not submit a claim under the Pogo Policy until on or about August 18, 2020, and that a month after the formal claim under the Pogo Policy was submitted, Defendant denied the claim in a letter to Plaintiff dated September 18, 2020. (*See* docs. 74-6 at 35-37; 74-9 at 8-9.) Plaintiff fails to explain how this time line of events evinces the extreme conduct necessary for bad faith where an insurance claim has been properly denied. The majority of Plaintiff's bad faith allegations concern its claim for Spill B under the Paladin Policy, and are relevant to its separately-asserted claims for bad faith under the Paladin Policy. Plaintiff fails to allege or provide summary judgment evidence to raise a genuine issue of fact that it suffered an injury independent of its policy claim under the Pogo Policy because of extreme conduct by Defendant. Defendant's motion for summary judgment is granted on this claim.

## VI.  CONCLUSION

Both motions for partial summary judgment are **GRANTED in part** and **DENIED in part**. Plaintiff is entitled to summary judgment on the liability portion of its breach of contract claim under the Paladin Policy. Plaintiff's claims for breach of contract, declaratory judgment, and bad faith under the Pogo Policy are **DISMISSED with prejudice**.  Remaining for trial are Plaintiff's claims under the Paladin Policy for declaratory judgment and bad faith, as well as the issue of damages for the breach of contract claim.

**SO ORDERED** this 31st day of January, 2022.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

43